## Byrd, et al. v. Anderson, et al.

(Decided February 13, 1925.)

### Appeal from Metcalfe Circuit Court.

Mines and Minerals—Lease of Gas Well Construed to Require Lessee to Pay Royalty Only During Time there was an Appreciable Flow of Gas from Well.—Lease of gas well, providing stipulated minimum monthly royalty and an excess royalty on production beyond stated quantity, construed, and held to require payment of minimum rental so long as well produced any appreciable quantity of gas, but not after the flow of gas entirely ceased; the exhaustion of gas terminating the lease.

J. W. KINNIARD and STEPTOE & JOHNSON for appellants.

V. H. BAIRD, BASIL RICHARDSON and M. O. SCOTT for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

The appellees herein in April, 1922, leased to the appellants a gas well in Metcalfe county under a lease, the provisions of which pertinent to this appeal are as follows:

"That said first parties (appellees) have this day agreed to sell and do sell to the second party (appellants), his heirs and assigns, gas that may flow from said well at the following amount, to-wit: for the sum of $150.00 per month, the minimum amount, but if there should be used during any month more than the sum of 7,500,000 cubic feet of gas, then in that event the said second party, his heirs or assigns, agree to pay the first parties the sum of two cents per 1,000 cubic feet, to be measured by the meter at ten ounces above atmosphere pressure. In no event is the second party to pay the first parties less than $150.00 for any one month.

"It is further agreed that the payment for said gas is to begin within four months from the executing of this contract, and is to continue for six months after the completion of a carbon plant, that the second party or his assigns will erect on a tract of land that the first parties have this day leased to the second party for the said purpose, and the said second party further agrees to purchase and pay the first party for gas from said well thereafter at the same amount per month, provided said well should produce as much as the 7,500,000 cubic feet per month, and if said well does not produce said amount to pay at the rate of two cents per 1,000 cubic feet for same so long as the said second party, or his heirs and assigns should operate said carbon plant as contemplated in the contract of lease this day made between the parties hereto."

In accordance with this lease, the appellants erected a carbon plant on appellees' land and began the operation of their carbon plant. It is agreed that the effective date of the beginning of the rent was August 13, 1922. At the time the parties were negotiating for the above lease, the evidence shows that the gas coming from the well in question was under a very high pressure, but at the time the carbon plant began its operations the pres-

sure had declined very materially. The plant was operated for two months and for this period appellants paid appellees the monthly rental as provided. The evidence shows that during this operation, the pressure in the gas well in question steadily diminished. By the last of August, the pressure had declined to two pounds. By the 6th of September, the pressure was zero. After a shut down for some fifteen hours the pressure rose to 2½ pounds and then steadily declined again until the 12th of September when the gas gave out. After a shut down of some twelve hours the pressure again rose to 2½ pounds, and then declined again. After a shut down of nine hours on the 15th of September, the pressure rose to 3 pounds, declined to ¾ of a pound on September 27th, and by October 5th the pressure was zero. In the meantime another well had been coupled up with the well of appellees, but even the combination was unable to run the plant. It is shown that the night before the plant finally shut down, which took place on October 5th, as much as 18,000 cubic feet of gas were consumed, but how much came from appellees' well and how much from the other well is not shown, although it is fair to assume that practically none came from appellees' well since the pressure there was zero, and so far as this record shows, gas will not flow to any appreciable extent with a zero pressure. Although some gas may be in a well, as appellants admitted with reference to appellees' well at the time they quit, yet if the pressure is zero, to all practical purposes the well is exhausted. It is further shown that appellees, who under the lease had a right to use a portion of the gas for domestic purpose, complained of the pressure they were getting and of the fact that they were getting no gas or practically none for their own use. A carbon plant must be operated continuously and under even conditions if it is to be successful, and the plant here could not be operated successfully or at all with the conditions noted. After the close down of the plant on October 5th, appellants declined to pay any more rent and appellees brought this suit for the four remaining months. The appellants defended this action on the idea that the gas in the well had failed utterly and was completely and fully exhausted and for that reason they were exonerated from having to pay any more rent. The appellees insisted that under the lease the obligation on the part of the appellants to pay rent for the six months was

absolute, and they were obliged to pay the minimum rent whether or not they procured any gas from the wells. The lower court put the burden of proof on appellants and at the close of their case, which disclosed the facts substantially as set out herein, the lower court on motion of appellees peremptorily instructed the jury to find for them on their claim. Appellants first insist on this appeal that a fair construction of the lease is that the lessors were obligated to furnish a minimum of 7,500,000 cubic feet of gas a month and that the minimum rental was bottomed on this obligation. In this we cannot agree. Reading the provisions of the lease over carefully, it seems to us that it peremptorily provides that a minimum rental of $150.00 per month was to be paid for the gas that flowed from said well although it may not have reached the figure of 7,500,000 cubic feet beyond which the obligation to pay additional compensation began. At least, so long as gas came from the well in any appreciable quantity, the obligation to take and use it and to pay the minimum rental was upon the appellants.

Appellants next insist that their obligation to pay the minimum sum of $150.00 a month ceased upon the exhaustion of the gas, and this is the real storm center of this case. In Auxier Coal Co. v. Big Sandy & Millers Creek Coal Co., 194 Ky. 14, 238 S. W. 189, the question was presented of the obligation of a lessee to pay minimum royalties under a coal lease. In that case the court said:

> "It was agreed in the lease of June 15, 1911, that the lessee should have the exclusive right and privilege of mining all seams of coal in or under the leased premises, and, further, that the lease was made for the sole and 'only purpose of mining and shipping coal and manufacturing and conducting a general merchandise business in connection therewith.' While the term was for 25 years and the lessee agreed to pay stipulated minimum royalties during the term, the intent and purpose of the lease must be read into its provisions, and it having become impossible through no fault of appellees to effectuate that purpose, it necessarily results that the lease is terminated." The exhaustion of the minable coal in the land must, in our view of the law, be held to have the effect of terminating the contract.

In 27 Cyc. 718, the author says: "Mining leases frequently contain a provision for the release of the lessee from payment of rents or royalties in case the mineral becomes exhausted or is found not to exist in paying quantities, and in such case the happening of such contingencies releases the lessee. Even in the absence of such a provision it is usually held that a lessee on a royalty basis is released from payments after the mineral becomes exhausted, or is found not to exist in paying quantities, although the lease provides that he shall take out and pay royalties on a certain amount each year, or that the royalties shall not be less than a fixed amount per year, for by such an undertaking the lessee contracts merely for promptitude and thoroughness in taking out existing mineral."

In Boyer v. Fulmer, 176 Pa. St. 282, land was leased for a term of 15 years for the purpose of mining for iron ore. The lease said: "In no year shall the amount to be paid by the first party be less than $400.00." The court, in denying the right of the lessor to collect the $400.00 each year from the time the ore became exhausted and until the lease expired, said: "This obligation proceeded upon the assumption that the ore was there, and continued to be there, in sufficient quantity to enable the lessee to perform his contract in this respect. If the ore was not there at all, or became exhausted, . . . the lessee was not bound to pay for it." In a similar case concerning a clay pit, the court, in Adams v. Washington Brick Company, 38 Wash. 243, said: "The possibilities based upon the assumed extensive existence of clay prompted these parties to enter into this agreement. The contract was drawn upon the assumption the clay would last five years. It did not. When it became exhausted, the essence of the entire transaction was gone." In Hiller v. Ray & Co., 59 Fla. 285, where the lease provided for a minimum rental "whether mining is carried on or not" the court held that the rental need not be paid if the mineral became exhausted, saying: "The contingency sought to be provided against was the failure to mine, not the failure to find rock to mine, for the contract assumed and contemplated the existence of the rock as its subject matter." See also Virginia Iron, Coal & Coke Co. v. Graham, 124 Va. 692. The case of Runyan v. Culver, 168 Ky. 45, 181 S. W. 640, does not announce a contrary doctrine. There the performance of a log contract was interfered with by a flood, an act of God, and as the parties had not

provided against such a contingency the court held that the intervention of this act of God did not absolve the party who had agreed to cut and raft the logs from his obligation. There is a clear distinction between that character of cases where performance is interfered with by a natural calamity, an act of God, riots, and the like, which the parties know may occur, and which if not provided against, will not absolve them from a failure to perform, and that character of cases where the failure to perform is occasioned by the failure of the continued existence of the subject matter of the contract which is the very essence of the matter. 6 R. C. L. 1002. In the case at bar it is perfectly plain that the lease of the gas well was made for the purpose of the operation of a carbon black plant, which requires for its operation a continuous and steady flow of gas. It is hard to presume that the parties would have made the contract they did except on the assumption that gas would continue to flow during the period of the contract. The evidence developed in the case, as far as it was allowed to go, showed that although there might be some gas in the well, yet on account of the absence of pressure it would not flow and a gas well which does not flow is the same as no well at all. Under the principles announced in the cases cited, and especially the Auxier case from this jurisdiction, the exhaustion of the flowing gas must, in our view of the law, be held to have the effect of terminating the lease. The gas having ceased to flow through no fault of the appellants it necessarily results that the lease was terminated. Therefore, on the evidence before it the lower court was in error in peremptorily instructing the jury to find for appellees.

The judgment is therefore reversed with instructions to grant appellants a new trial in accordance with this opinion.

Judgment reversed.