## Swiss Oil Corporation et al. v. Riggsby et ux.

(Decided June 6, 1933.)

(As Modified on Denial of Rehearing Jan. 30, 1934.)

E. L. McDONALD and KIRK & WELLS for appellants.
FRED HOWES for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Reversing.

When this case was here on the former appeal (Riggsby v. Swiss Oil Corporation, 240 Ky. 543, 42 S. W. [2d] 732, 736), the principal issue was the construction to be given the oil and gas lease as modified by an agreement made by the parties in compromise of their differences respecting its terms. It was held that the obligations extended beyond 1926, which was the expiration of the definite ten-year period stipulated. That question and a secondary one as to the proper measure of damages for failure to furnish the lessors with gas for domestic purposes were the only things decided. During the course of the opinion, it was said that the lessee was guaranteed against the forfeiture of the lease so long as it paid the annual royalty of $200 a year,

and that it could be relieved of the payment by drilling the two wells, "and, perhaps, also by convincing proof that neither oil nor gas could be found in paying quantities if such drilling was done." A plea had been made that the modified lease had been abandoned by the lessee with the acquiescence of the lessors, and that was set up by way of estoppel, but the case had not been developed on that issue. Upon return to the trial court, the lessors, as plaintiffs, amended their petition to set up the criterion of damages held to be proper by this court, and the defendant amended its answer and more definitely pleaded the abandonment and acquiescence, or the mutual cancellation of the lease, and as well made the specific plea of termination of the lease by reason of the exhaustion.

Upon the retrial the lower court denied the defendant's claims and rendered judgment for the accrued annual royalties or rents, aggregating $1,000, and also for $1,000 damages for the failure to supply the lessors with gas for their home. Those issues are now before us.

In response, the appellees argue that the former opinion as the law of the case is a barrier to the consideration of anything but the damage judgment. We think it was clearly made to appear that the only things decided were, as stated, the construction of the contract and the measure of damages for its breach in respect to furnishing gas for domestic purposes. The case was left open for preparation in order that justice between the parties might be secured and administered. The further proceedings were authorized. Sailsberry v. Sailsberry, 140 Ky. 731, 131 S. W. 802; Clark's Heirs v. Boyd, 152 Ky. 234, 153 S. W. 227; Ellis v. Darby Coal Company, 238 Ky. 692, 38 S. W. (2d) 673, and cases cited therein.

The court having reached the conclusion on this appeal that the case should have been decided below in favor of the appellant upon the ground that the lessee was relieved of further obligations under the contract because it had terminated by reason of the cessation of gas, it is not necessary that we should consider the other points raised.

■ There is first to be given the reasons for concluding that there was an exhaustion of gas as measured by the terms of the contract.

The lease was for a term of ten years from its date, May 2, 1916, "or as long as gas or oil is found in paying quantities on said premises." The supplemental contract executed May 4, 1933, carried the same provisions into it. The lease provided:

> "If gas is found in sufficient quantities to transport the second party [lessee]' agrees to pay $100 annually for each well for gas so transported, and first party [lessor] to have gas at well free of cost to heat and light one dwelling."

It is a common expression in oil and gas leases that it shall continue beyond the stipulated period "as long as oil and gas is found in paying quantities." This is usually regarded as being for the benefit of the lessee, "for it is obvious that a prudent man would not want to pay rent for premises if they had ceased to be productive; nor would he care to operate them on even a royalty where the operating expenses are more than the income." Section 230, Willis' Thornton on Oil and Gas.

A different rule from that applied to the phrase "paying quantities" in respect to oil is recognized in respect to gas, principally because of the difference in nature, in methods of gathering, media of transportation, and availability of the markets, which, with other reasons, are fully stated in section 237 of Willis' Thornton on Oil & Gas. The difference would seem to be not in the principle of terminating a lease because of failure of production in paying quantities, but rather in the matter of measurement or criteria. The term "paying quantities" is usually defined as being such quantities as will pay a profit, but at least the cost of operating the well. The lessee is not required to market the gas at a loss, but only when there is a reasonable profit, and in determining whether it could be so marketed, the distance to the market, the expense of marketing, and every similar circumstance should be taken into consideration. In determining whether or not a gas or oil well is productive to this extent, the judgment of an experienced operator or lessee, if exercised in good faith, will prevail as against that of a lessor without experience. Bay State Petroleum Company v. Penn. Lubricating Company, 121 Ky. 638, 87 S. W. 1102, 27 Ky. Law Rep. 1133; Sections 231, 234, 490, 507, and 538, Willis' Thornton on Oil & Gas. We recently treated this subject with some degree of fullness in Warfield

Natural Gas Company v. Allen, 248 Ky. 646, 59 S. W. (2d) 534, in which many authorities are cited. See, also, Byrd v. Anderson, 207 Ky. 317, 269 S. W. 323, and Browning v. Blanton's Adm'r, 241 Ky. 739, 45 S. W. (2d) 1.

It will be noted that the duration of this lease as it related to gas was not merely that the production should be in paying quantities, but that it should be in sufficient quantities to transport. Reading together all the terms of the modified lease and the legal interpretations above, the gauge to be applied to the evidence, which the lessee here asserts establishes its right to termination of the contract, is whether gas could have been produced from the premises in sufficient quantities to transport and market with a profit to the lessee, considering the cost of production and transportation, and the available market, as of January 1, 1928, regard being had, of course, for the matter of reasonable prudence and diligence on the part of the lessee.

No well was drilled upon this lease, but there were wells all around it. The lease called for a minimum of two wells and a royalty of $100 for each gas well. Under the supplemental contract, the company had been paying $200 a year in lieu of drilling so that the lessee was as well off as if his land had been drilled and the minimum requirements had been met. The appellant had sixty-nine gas wells in this field and was for a time under contract with a distributing company to furnish it with gas. However, after a loss of about $129,000 had been incurred, and when it was found that the cost of production over receipts during the last seven months was about $4,000, without any regard being had for the capital investment, the contract with the distributor was canceled by a compromise agreement after some litigation. So on August 1, 1927, the company ceased marketing the gas from the field except in a negligible quantity, and plugged and altogether abandoned several nearby wells. The evidence of a notice of an intention to abandon this lease and an acceptance by the appellees is in conflict, but it is certain that by January 1, 1928, the company had removed its pipe line from appellees' property and he was aware of a purpose to abandon his lease. See American Wholesale Corporation v. F. & S. Oil & Gas Company, 242 Ky. 356, 46 S. W. (2d) 498.

Under the modified lease the agreement was in effect to pay and receive royalties as if there were in fact two gas wells on the appellees' premises, and it must be determined whether or not at the time of the surrender there was a failure of gas in that property in sufficient quantities to transport, or in paying quantities as above defined. If there was such a condition in the field or the neighboring property, the proof is that the same condition existed as to appellees' premises. It is manifest that the neighboring wells drew off appellees' gas just as effectively as if a well had been brought in on their seventy-five acres.

We note the factual evidence in addition to that already stated. It was shown that the immediate field was only gas territory and that because of the depletion in the supply several leases had been abandoned. At the beginning of 1928, the nearby leases to the Riggsby property produced small quantities of gas, but not sufficient to market. The company had a number of oil wells in that section of the country, the closest being about three-fourths of a mile from the Riggsby property, and air was pumped into forty-two of those wells to increase the flow. Gas from this field was used as fuel for some of the pumps. All of the gas wells seem to have been connected in order to secure that supply. The entire production of the pool was approximately 200,000 feet daily, but the sixty-nine wells could have been made to produce 400,000 feet under atmospheric pressure or open flow. But it is said that could not have been done if the gas had to be put into a pipe line under pressure; or at least it would have been imprudent. Some gasoline was procured from the gas and used by the company, and during seven months in 1931 and 1932 a total of 3,000 gallons of gasoline was sold for about 10 cents a gallon. Gas was sold to eight residents of the neighborhood for domestic purposes.

We turn now to the opinion evidence. The company introduced its engineers and managing operators who went into detail as to the tests made for gauging production and the results of those tests. It is to be gathered from their evidence that, if there had been a market right at the door, gas could have been disposed of at a fair yield, but the location and distance of the wells from the market made it commercially unprofitable. An independent consulting geologist, having forty years familiarity with this field and who had made a

study of the conditions as of January 1, 1928, testified in detail. The gas in the pool, he believed, had by that time been pretty well exhausted. He stated as an expert conclusion that wells on this Riggsby lease could not have been expected to produce over 20,000 feet daily open flow, of which 4,000 feet could have been put on the market. At an 8-cent price this would have yielded only 32 cents a day in revenue, and that would, of course, have been unprofitable.

In Sawyer v. Potter, 223 Ky. 359, 3 S. W. (2d) 758, the lease was for five years "and as much longer as oil or gas is found thereon"; and provided for an annual royalty for each producing well while gas was being sold off the premises. A light gas well was brought in and the gas was piped to the lessors' residence and one or two others. The well was abandoned by the lessees. The standard of requiring production in paying quantities was applied and it was held that the production had not been sufficient to extend the life of the lease beyond the five years stipulated, notwithstanding the local distribution. In the companion case of Batten v. Campbell, 223 Ky. 363, 3 S. W. (2d) 760, where there was a small quantity of gas furnished locally but none marketed, the same conclusion was reached. For an application of the rule, see, also, Enfield v. Woods, 198 Ky. 328, 248 S. W. 842; Reynolds v. White Plains Oil & Gas Company, 199 Ky. 243, 250 S. W. 975; Byrd v. Anderson, supra.

While it appears that from all the wells in the field the company obtained enough gas for its own purposes and sold a negligible quantity locally, the proof is that this lease standing alone would not have produced gas in paying quantities, as that term is defined. Certainly, it would not have produced sufficient gas to transport, and the lease provides that when that condition arose it would expire. It must not be forgotten that the lessors received their share of the production of this field, for they have been paid the same money they would have been paid had the two wells been drilled on their land. Should the lessee have been put to the expense of drilling a well on the lease, at the estimated cost of $3,000, nothing more could have been shown than was by this evidence, to wit, that about 4,000 cubic feet could have been obtained from it for use or sale. There was no contradictory evidence produced.

We think it was convincingly shown that at the time of abandonment the gas was no longer present in paying quantities, or at least in quantities sufficient to transport at a profit.

■ It is earnestly insisted that the company bound itself by an absolute obligation to pay $200 each year and to furnish the lessor with domestic gas at all events "until one or two wells are actually drilled on said premises." There was the further agreement that as long as these annual payments were made "such payment shall be so construed and given the same effect as though one or more gas wells had in fact been drilled upon the premises during the ten years next ensuing the date of said lease"; and, moreover, that if both of the wells proved "not to be paying gas wells, then the said annual payment hereinbefore provided for shall terminate." This may indeed be said to record the selection by the parties of the drilling of the wells as the event which would determine the duration of the contract and that such method of discharge was possible of performance. The former opinion states the terms of the contract and this argument more fully. The effectiveness of the argument is there recognized. However, as stated above, the view is indicated that the obligation could be avoided by showing the exhaustion of the gas, and that point was left open. The legal proposition is now present.

We have a well-established principle of law that one party to a contract may demand performance although it has become more difficult or onerous to the other party and probably worthless to the one demanding it. Bates Machine Company v. Norton Iron Works, 113 Ky. 372, 68 S. W. 423, 25 Ky. Law Rep. 931; Runyon v. Culver, 168 Ky. 45, 181 S. W. 640, L. R. A. 1916F, 3; Stevens & Elkins v. Lewis, Wilson, Hicks Company, 170 Ky. 238, 185 S. W. 873. However, we may pause to observe that the trend is toward treating questions of subsequent impossibility of performance of a contract as the average man would treat them, and in cases in which performance is possible only at an expense which is ruinous to one party and of little or no benefit to the other, the parties should not be forced into such economic waste under penalty of an action to recover damages. Page on Contracts, secs. 2673, 2706. The appellee also invokes the rule that the terms of an express contract measure the rights of the parties to the exclu-

sion of other or different conditions or any liability or right to relief that might be considered as implied. 13 C. J. 243, 559; Page on Contracts, sec. 1438; Morford v. Ambrose, 26 Ky. (3 J. J. Marsh.) 691.

There is another principle widely recognized and applied to various classes of contracts. It is thus stated in Texas Company v. Hogarth Shipping Company, 256 U. S. 619, 41 S. Ct. 612, 614, 65 L. Ed. 1123:

> "It long has been settled in the English courts and in those of this country, federal and state, that where parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and availability the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it.'"

Early English cases declaring and distinguishing the principle are discussed in Singleton v. Carroll, 6 J. J. Marsh. (29 Ky.) 527, 22 Am. Dec. 95, from which the conclusion was reached that the owner of a slave could not recover his value of his hirer on account of a failure to return him at the end of the term according to the contract because the slave had run away.

This implied condition has come to be designated as impossibility of performance, although in some instances it is rather lax nomenclature, for in many cases it is not a matter of impossibility but of futility. For treatment of the subject, see Black on Rescission & Cancellation of Contracts, sec. 209; Willis' Thornton on Oil and Gas, secs. 179, 183; Annotations L. R. A. 1916F, page 31; 12 A. L. R. 1273; 74 A. L. R. 1289; Duff v. Bailey, 96 S. W. 577, 29 Ky. Law Rep. 919; Jones-Gray Construction Company v. Stephens, 167 Ky. 765, 181 S. W. 659; Ward v. Daugherty, 228 Ky. 326, 14 S. W. (2d) 1089; Juett v. C., N. O. & T. P. R. Co., 245 Ky. 379, 53 S. W. (2d) 551.

Thus there is an apparent conflict in legal principles. We do not understand, however, that in the application of the former principle—respecting the exclusion of implied terms, for which appellant contends

—it is quite as exacting as it appears from the general statement. The rule applies only where the express and the asserted implied provisions relate to the same subject-matter or some particular part thereof, and there is a conflict, in which case the express agreement would supersede the implied one. It is otherwise when there is no conflict. Illustrative is the familiar holding that the destruction by fire or other casualty of a building on leased premises terminates the lease and relieves the tenant from further payment of rent although the contingency was not provided for in the writing. Black on Rescission and Cancellation, sec. 460. Cf. Jones-Gray Construction Company v. Stephens, supra. Another illustration is the rule that an express warranty in a sales contract does not preclude the defense of an implied warranty that the article was reasonably suited to the use intended and that the seller knew of no latent defect undisclosed. J. B. Colt Company v. Asher, 239 Ky. 235, 39 S. W. (2d) 263.

Implied covenants supplementing those expressed in oil and gas leases are everywhere recognized. We quote from section 4 of Merrill's Covenants Implied in Oil and Gas Leases:

"Of course, the implied covenant is a fiction, used like other fictions by the law in order to get at a desirable result. The parties have not consciously agreed upon the terms which the law implies; it is even possible that they have never consciously directed their attention to the matter. The obligations are imposed, not by the agreement of the parties, but by the operation of law."

We cannot, therefore, agree with counsel for appellant that only the explicit letter of the contract must be regarded. The law recognizes that the continuation of the subject-matter of the contract is the essential foundation of the obligation. And when that subject-matter is shown to have become nonexistent, performance is excused and the contract terminates by operation of law. 6 R. C. L. 1005; Hall v. Eversole's Adm'r, 251 Ky. 296, 64 S. W. (2d) 891. As stated in Willis' Thornton on Oil and Gas, sec. 243:

"As the object in leasing oil or gas premises is to secure the oil or gas beneath the surface, as soon as it has been demonstrated that no oil, in case of an oil lease, or no gas, in case of a gas lease, is be-

neath the surface, or it does not exist in paying quantities, the lessee may abandon the premises or his lease; or if the oil or gas becomes exhausted he may in like manner abandon them." See, also, 40 C. J. 1034, 1055.

Neither in purpose nor in effect does such an implied provision abrogate or encroach upon the rule that express provisions of a contract shall control. This is not a matter of impossibility of performance on the part of the lessee to drill the premises or pay the stipulated rentals—it is a matter of futility of performance. Such implied condition was unquestionably annexed to the original lease in the case at bar, and the provision in the supplemental contract as to the annual payment was in lieu of the drilling of two wells until the lessee should deem it desirable to do that. Except for the supposition of the presence of gas and its continuation throughout the period of the lease, there would have been no contract. Continuation and profitable production were contemplated. It was demonstrated that at the time of abandonment and refusal to pay the annual royalty there was no gas there. The drilling of the wells would have been futile. It is not denied that the drilling would have effectually erased the obligation. Obviously if that had been done, since the gas was not there, the lessor could have collected nothing under the contract and the contract would have ended even though it is silent in that respect.

We are not without specific precedent. In Ward v. Daugherty, 228 Ky. 326, 14 S. W. (2d) 1089, 1090, in addition to the usual terms it was provided that in the event a test well then being drilled on an adjoining farm should prove to be dry, the lessee should drill two test wells on the leased premises within a specified time. In the event oil was produced in paying quantities from either of these wells, the lessee agreed to pay an additional consideration of $750 and also to develop the entire lease. The test well on the adjoining farm was dry, and the lessee drilled one test well on the leased premises. This proving to be dry, he abandoned the lease without drilling the second well as agreed. In the suit of the lessor, it was held he was entitled only to nominal damages; there being no allegation of the existence of oil. Said the court:

"It is difficult to see how appellant's lands would

have been enhanced in value by drilling another test well, unless it proved to be a producer, or how he could be damaged by a failure to drill such well, unless it could be asserted that oil exists therein. It must not be overlooked that the contract is to be construed from the viewpoint of both parties, and it is not to be thought that lessee was interested in testing appellant's land except for the purpose of development. He received nothing from any wells aside from development. Indeed, he paid a consideration for the privilege of drilling them, and the only thing he could look forward to was the value of the oil from the developed lease. It is therefore evident that development was the real purpose in the minds of the parties to the contract.''

The obligation in that contract to drill the second well, which would have been futile, was no less than the obligation in this contract to continue payment in lieu of drilling two wells, which would also have been futile. See, also, Duff v. Bailey, supra; Clark v. Cooper, 197 Ky. 530, 247 S. W. 929.

More or less analogous is Woodworth v. McLean, 97 Mo. 325, 11 S. W. 43. McLean contracted for an undivided interest in land in consideration that he would sink a shaft to the depth of 500 feet on the vein or ore cropping out on the claim. He sunk the shaft 330 feet and refused to carry it farther because the vein of mineral had given out. In the owner's suit for damages for breach of contract, the court held that if in the progress of the work all indications of valuable mineral ceased and the vein had terminated, the requirements of the contract would be met and that there was no obligation on McLean to proceed farther.

The principle of declaring or considering a lease terminated and the royalty obligation canceled when the subject-matter fails has been considered and applied in several cases where coal and other solid minerals were shown to have been exhausted or to be nonexistent. Many of them are reviewed in Laurence E. Tierney Land Company v. Kingston-Pocahontas Coal Company, 241 Ky. 101, 43 S. W. (2d) 517. See, also, Byrd v. Anderson, supra; and Hall v. Eversole's Adm'r, supra; 40 C. J. 1005.

The court is of the opinion that this rule must be applied in the case at bar, and that the contract in-

volved terminated on January 1, 1928. That being so, of course the lessors were not entitled to any damages or recovery.

Wherefore the judgment is reversed for consistent proceedings.