**UNITED STATES of America,
Appellant,**

v.

**2,847.58 ACRES OF LAND, MORE OR LESS, Situated in BATH, ET AL., COUNTIES, COMMONWEALTH OF KENTUCKY (Ernest F. Brackmier et al.), Appellee.**

**No. 75–1573.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 16, 1975.

Decided Jan. 13, 1976.

Eugene E. Siler, Jr., U. S. Atty., Lexington, Ky., Lawrence E. Shearer, Wallace H. Johnson, George R. Hyde, Appellate Section, Land and Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., for appellant.

Edward S. Gilson, Jr., Lexington, Ky., George I. Cline, Thomas R. Burns, Morehead, Ky., for appellee.

Before EDWARDS, CELEBREZZE and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

The government appeals from the judgment entered on a jury verdict awarding compensation for mineral interests taken by condemnation. The government had acquired the surface of the land in Bath County, Kentucky, some years prior to filing the present action on March 7, 1972 to acquire the mineral interests. This appeal concerns oil in place under various tracts, and a number of landowners are involved. The mineral interests condemned are located in the Ragland oil field which was first developed in the early 1900's and produced approximately 1,000,000 barrels of oil between that time and 1971. The wells in the Ragland field operated more or less continuously from the inception of the operation until the 1930's. During the depression the field was virtually closed, but in the period from 1944 to 1946 production was resumed.

The government has raised a number of issues on appeal, and the court will deal first with those which apply to all landowners and all tracts before addressing a question which applies only to a single landowner and two tracts. The record indicates that a very small amount of oil was being recovered as primary production from the Ragland field at the time of the taking and that the value of the mineral interests condemned would necessarily depend to a large extent on whether the residual oil is recoverable by secondary means. The government contends that the evidence of value of the mineral interests introduced by the owners was insufficient in two respects: (1) That no particular method or process for secondary recovery of oil and gas from the Ragland field was testified to in specific or concrete terms, and (2) that the witnesses relied on two "rules of thumb" to arrive at the values they assigned to the various tracts.

The owners presented three expert witnesses. Edmund Nosow, a consulting geologist, testified concerning all of the tracts involved in this appeal.

This witness had worked as a geologist, both for the State of Kentucky and in an independent capacity for many years. He testified to his long familiarity with oil and gas production in various parts of Kentucky and his particular study of the history of the Ragland field. The witness stated his opinion that the Ragland field has great quantities of oil remaining in place that can be taken out economically and commercially and that the field is feasible for secondary recovery operations. He described successful secondary recovery operations in various fields, particularly the Big Sinking field which he testified bears a "strong relationship" to the Ragland field. When questioned on his qualifications as an expert on secondary recovery, this witness testified that there are a number of methods used in various parts of the world, but that he was limiting his testimony to those methods which he felt would be successful in the Ragland field. On cross-examination Mr. Nosow was asked what particular method of secondary recovery he felt could be successfully employed in the Ragland field and he replied that water flooding would be successful if it were used in conjunction with other secondary methods. The witness then proceeded to describe other secondary methods that he felt would work. These included the "Ingasco" method which he said would "absolutely" work in the Ragland field, the vacuum system, with which he had had experience in a vugular dolomite field, the same formation as the Ragland field, in Allen County, Kentucky, and various thermal processes including "Insitu Combustion" followed by water flooding.

Thomas Glenn, a petroleum engineer, also testified on behalf of the owners and stated that he had worked at the Big Sinking field which is known for its secondary recovery. He described the similarity between the main geologic formation in that field and in the Ragland field. Glenn expressed an opinion that a combination of secondary recovery methods would succeed in the Ragland field as they had in Big Sinking.

John Campbell, a petroleum engineer, testified on behalf of one of the landowners as an expert on secondary recovery. This witness described a number of methods of secondary recovery, including water, gas injection and on-site combustion. He proposed water flooding as a method to recover oil from the Ragland field while admitting that it might be necessary to alter the viscosity of the oil in order for the water flooding to succeed. Witness Campbell testified that there are a number of known techniques by which the character of oil in place can be changed so that secondary recovery by water flooding will be successful. All three witnesses testified that it is sometimes necessary to employ a combination of secondary recovery methods in a given field where a single method such as water flooding alone might not succeed.

From the foregoing abbreviated recitation of the testimony of these witnesses concerning secondary recovery it is clear that the government's contention that they were not qualified to testify on the subject and that they failed to point to a single specific method of secondary recovery which would apply to the Ragland field is without merit.

■ The government also complains that value witnesses for the owners resorted to a rule of thumb in estimating the amount of oil still remaining in place beneath the condemned tracts. Two witnesses testified that at least as much oil could be recovered through secondary recovery methods as had been produced by primary recovery. These estimates which the government characterizes as "rules of thumb" were based on studies of the results of actual secondary recovery operations in other fields. These results were related to the primary production history of the various tracts involved in this action. Each witness gave a basis for his estimate of the amount of recoverable oil in place and all were cross-examined on their estimates. The fact that the expert witnesses produced by the government made different estimates of the amount of recoverable oil in place, based upon their study and ob-

servations, at most made an issue for the jury. Each of the three witnesses produced by the owners was qualified as an expert geologist or petroleum engineer. To attempt to disqualify their testimony by asserting that it was based on "rules of thumb" totally ignores the extensive testimony by each of them concerning his training and experience in dealing with actual oil and gas operations in Kentucky. In *United States v. 79.95 Acres of Land, etc.*, 459 F.2d 185, 188 (10th Cir. 1972), the court stated, "We appreciate the fact that there can be no absolutes in the speculative area of oil reserves. Reliance must necessarily be placed on expert testimony." We agree.

■ The second "rule of thumb" objection arises from the government's contention that the witnesses Nosow and Glenn valued the various interests by multiplying the estimated number of barrels of recoverable oil by $1.00; that is, that they employed a unit-times-price method. It is true that several of the estimates of value given by these experts equalled $1.00 for each barrel of recoverable oil which they estimated to be in place under the various tracts. The witness Nosow emphasized the fact that he was not giving the value of the oil if it were produced and brought to the surface, but was testifying to what a willing buyer would pay and a willing seller would take for these mineral reserves in place. He testified that he did not concern himself with the cost of producing the oil since he was testifying to its market value in place. On cross-examination, after agreeing that he valued the interests at "more or less" a dollar for each barrel, Nosow said, "I figured what a willing buyer would pay a willing seller for the oil in place that could be recovered."

The witness Glenn testified that he used a formula that oil in place in this field would sell for $1.00 per barrel. He further testified that it is a common practice to buy and sell oil reserves on the basis of a price per barrel for recoverable oil in place. Like Nosow, this witness did not make an economic analy-

sis of the cost of production. Though the government argues otherwise, the witness Campbell who testified with respect to one tract only, obviously did not rely on a unit-times-price calculation in reaching his estimate of value. Campbell assumed that 35 to 55 per cent of the original oil volume would be recoverable by a secondary process and his ultimate estimate of the value of the tract was not $1.00 per barrel. He based his calculations on the value of the oil after it was recovered, less certain specific costs.

The government states that "[t]his units-times-price method of valuation has been specifically held to be too speculative in nature to permit its introduction in federal eminent domain proceedings, or to so denigrate the value of a witness' testimony based upon such a method as to render that testimony worthless." The government relies principally upon a statement in *United States v. Indian Creek Marble Co.,* 40 F.Supp. 811, 822 (E.D.Tenn.1941). That case involved a partial taking of a landowner's property rather than an entire taking such as is involved in the present case. As the district court in *Indian Creek Marble* correctly pointed out, where there is a partial taking the "before and after" rule applies in determining value. The individual items affected by the condemnation are not valued separately in such a case since they are taken into account in determining the "after" value of what remains following the condemnation. The marble in place was not the thing being condemned in *Indian Creek Marble,* but its value was lost to the landowner, according to his theory, because an easement destroyed the right to quarry and market the marble. Under these circumstances, a unit-times-price method of valuation would be inappropriate since any loss attributable to the inability to quarry and market the marble would properly be reflected in the "after" value of the property. Furthermore, there was no testimony that an established market existed for marble in place.

We do not read the *Indian Creek Marble* case to establish a rule that unit-times-price valuations are never to be received as evidence in federal condemnation actions. In the present case, the government condemned the entire mineral interests of the owners and there was testimony of a common practice of buying and selling such interests in place. Expert testimony of what a willing buyer would pay for such interests and a willing seller would accept, both being under no compulsion, was perfectly competent to establish value. The record discloses that what the government characterizes as a "rule of thumb" was, according to qualified experts, a formula used in the marketplace.

The government also relies on *Mills v. United States,* 363 F.2d 78 (8th Cir. 1966), and *United States v. 339.77 Acres, etc.,* 420 F.2d 324 (8th Cir. 1970). A close reading of each of these cases reveals that the Eighth Circuit rejected a unit-times-price approach to valuation in each instance under circumstances quite different from those existing in the present case. In *Mills,* the witness who used this approach merely testified that he would be interested in buying the tracts at the unit price, but there was no testimony of an established market for the product if it were mined and the court noted that the witness ignored the fact that there was a large excess in the fields over demand. 363 F.2d at 80–81. In *United States v. 339.77 Acres, supra,* the landowner produced no expert witnesses as to the value of the coal in place, but merely testified to a value reached by the unit-times-price method on the basis of very limited production. Again, as in *Mills,* there was no testimony of established market for the coal in place. It is interesting to note also that the Eighth Circuit did not hold such evidence inadmissible, but merely held that it was of limited probative value.

The government also cites *United States v. Sowards,* 370 F.2d 87 (10th Cir. 1966). In that case, the landowner testified to the value of coal in place on the

basis of unit times price and no other evidence of value offered by the property owner was admitted. A government valuation witness who had expert qualifications testified to a much lower value for the coal in place. The court of appeals reversed an award based on a jury verdict on the grounds that the property owner failed to show that a market existed for such coal or that coal of similar quality had been sold in the neighborhood in recent years at any price and that the property owner's reason for his valuation was the "possible" demand for coal in a nearby town. The court held that his evidence lacked probative value because it "reflected only a future hope." *Id.* at 91.

The government witnesses in the present case testified that they knew of no comparable sales to use as a basis of establishing the fair market value of the oil and gas interests involved in the condemnation. Where this measure is lacking the Supreme Court has stated that market value must be estimated, and what a willing buyer will pay and a willing seller will accept may be deemed to establish such value. *Olson v. United States*, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236 (1934). In *Welch v. Tennessee Valley Authority*, 108 F.2d 95, 101 (6th Cir. 1939), *cert. denied*, 309 U.S. 688, 60 S.Ct. 889, 84 L.Ed. 1030 (1940), this court stated:

> Sales at arms length of similar property are the best evidence of market value. However, in the absence of such sales, there is no single measure of value which may be applied rigidly and uniformly in the determination of the market value of lands, and each case must be considered in the light of its own facts.

In *United States v. Sowards, supra,* the court noted that where comparable sales do not exist the measure of compensation remains the same, but other evidence must be used to determine value. The court went on to say "The law of evidence in federal courts favors a broad rule of admissibility and is designed to permit the admission of all evidence which is relevant and material to the issues in controversy, unless there is a sound and practical reason for excluding it." (citations omitted) *Id.* at 90. The evidence on value introduced by the owners in the instant case was competent. The witnesses based their testimony on familiarity with the market for mineral interests such as those owned by the defendants, and used the "willing buyer-willing seller" test for determining market value.

■ The government next complains that the district court's comments on the evidence constituted a clear abuse of discretion. The court's charge to the jury must be read as a whole and, when so read, the charge in the present case appears to have presented the issues fairly to the jury. We do not count the words or pages used in summarizing each party's contentions and hold that the entire charge was not evenhanded because a District Judge spent more time summarizing the evidence of one party than that of the other. The district court carefully pointed out to the jury the lower value placed on the mineral interests of each tract by the government witnesses as well as the higher values given by the property owners' witnesses. The court also noted with respect to the mineral leases of one of the owners that an expert witness produced by the government had testified that there was insufficient oil in place in the Ragland field to justify any secondary recovery effort and that it would not be economically feasible to undertake to produce oil from the field. Finally, the court advised the jury that it could not compute value merely by using a unit-times-price formula. We find no merit in the government's complaints concerning the jury instructions.

■ It is also contended that the court coerced the jury by using a modified "Allen charge." This contention is totally without merit. It is true that the District Judge urged the jury to reach a verdict and advised them that they should not be concerned about the technical nature of some of the testimony

because a jury of laymen would ultimately be required to decide the issue of compensation. The record reveals that the District Judge, immediately before submitting the case, stated to the jury, "I want to emphasize to you that giving a verdict is entirely the prerogative of the jury. The Judge has nothing to do with that. I don't want you to get the impression that I am insisting on your making a verdict. That is your prerogative entirely. I discharged my duty as much as the law requires of me. Now it is the duty of the jury to decide the case. I do not want to indicate that you have to now but it is important that you decide if you feel you can possibly do so."

After conferring for approximately one hour the jury returned to the courtroom and asked, "Do we have to reach a verdict?" The court responded, "Well, of course, I can't say that the jury has to do anything. That is our system. The jury can exercise its own power." The court then went on to state that some jury would eventually decide the question of value and that it would have to be a unanimous verdict. The court observed that a retrial would be expensive to everybody involved and that he felt the jury, after thorough discussion, should be able to reach a verdict. In this discussion the court again said, "I can't require you to make a verdict." It was immediately following this proceeding in open court that the government made a motion for mistrial on the basis that the court had given an "Allen charge." The following day the jury returned the verdicts which are the subject of this appeal. The district court did not put unreasonable pressure on the jury to reach a verdict.

The final appellate issue relates only to two tracts under lease to Ernest F. Brackmier and others. Shortly before the trial began the government filed a motion to dismiss the Brackmier lessees as parties on the theory that they had no property interest in the mineral rights being condemned. This motion was overruled. The government then filed a motion to determine the Brackmier interests in the two tracts and requested a

preliminary hearing by the court. Immediately prior to the start of the jury trial the district court held a non-jury hearing and determined that the Brackmier leases were in force on the date of taking and that a jury should determine the value of the mineral interests which were subject to these leases.

On appeal the government argues that the district court did not actually make a determination of the validity of the leases, but merely held that this was a jury issue. A close reading of the transcript of the limited preliminary hearing does not sustain this position. The government was attempting to prove that the Brackmier leases were not producing oil or gas in paying quantities, and thus had expired. The primary terms of the Brackmier leases had concluded and their validity depended upon whether or not they had been extended by the production of paying quantities of oil or gas. Thus much of the government's evidence at the preliminary hearing concerned the amount and value of the oil produced on the Brackmier leases after their primary terms had ended. The District Judge commented that this evidence went to the value of the leases, rather than the question of their validity, and would necessarily be addressed to the jury. But he agreed to decide the validity issue and stated clearly the issue of law which the court was required to determine.

It is next argued that the district court misapplied Kentucky law in concluding that the Brackmier leases remained in force until March 7, 1972. The government called Ernest F. Brackmier as a witness. He testified that he had purchased the two leases in question in 1950 and 1953. One lease was producing oil when he bought it and he drilled a producing well on the other within six months. He described the operations on the two leases and stated that Ashland Oil and Refining Company had purchased the oil production and paid royalties directly to the owners of the minerals pursuant to a division order. He stated that prior to the time the govern-

ment took possession of the surface of the land oil was pumped from wells on both tracts to collection tanks where Ashland Oil picked it up. The witness further testified that production was drastically reduced after the government "takeover" on April 13–22, 1970.

The district court ruled that this witness (Ernest F. Brackmier), called by the government, had shown that oil was produced in paying quantities. At this hearing Brackmier was not required to answer questions relating to the profitability of his operations under the leases. The government then "proffered" a witness who would testify that the Brackmier leases had operated at a loss from 1965 to 1970. The court ruled that even if he accepted as true the tendered proof, this would not be sufficient to prevent the Brackmier claimants from presenting proof in support of their claim of damage from the taking of the "total oil lease." Immediately thereafter the district court held the leases valid as a matter of law.

The law of Kentucky is somewhat confusing with respect to the requirements for keeping in force a lease of mineral rights for a fixed period and for as long thereafter as oil or gas is produced from the leased land by the lessee. However, an examination of pertinent cases from the Kentucky Court of Appeals discloses a rule which applies to the facts of this case.

Most of the cases dealing with the question of whether a mineral lease has expired for failure of production during a "thereafter" extension have involved attempts by a lessor to have a lease cancelled. In *Hughes v. Busseyville Oil and Gas Co.*, 180 Ky. 545, 203 S.W. 515 (1918), the thereafter clause required production in paying quantities. The court found that the digging of one well and the production of oil sufficient to pay a royalty of $180.00 per year to the lessor after the conclusion of the primary term satisfied the requirement of production in paying quantities so that the lease remained in effect. The court noted that forfeiture of such leases is favored where a lessee merely ties up

the property for speculative purposes and makes no real effort to obtain production, but determined that the case before it did not involve such a situation. In *Enfield v. Woods*, 198 Ky. 328, 248 S.W. 842 (1923), also an action by a lessor to cancel a lease which was to continue after its primary term for "as long thereafter as oil and gas, or either, is produced therefrom by the lessees, . . . ." the court stated:

> The general rule, however, is to hold the expression "oil well" or "gas well," as used in a lease contract, to mean an oil well or gas well which can be profitably operated as such. (citations omitted). 248 S.W. at 843.

The court noted in the *Enfield* case that the lease did not require production in paying quantities, and held that where the requirement is merely that oil or gas be produced from the leased premises there must be production of oil or gas "in such quantities as to be susceptible of division, so as to pay the landowner a royalty, even though small."

In *Reynolds v. White Plains Oil and Gas Co.*, 199 Ky. 243, 250 S.W. 975 (1923), a lessor sued for cancellation of the lease on the ground that the lessee was not producing oil or gas in paying quantities. The lessee had sunk three wells and two were producing oil. Pumps were attached to these wells and the oil was pumped to storage tanks and marketed through a pipe line to which the tanks were connected. The lease did not require production in paying quantities, but the court held that even if such a provision were contained in the lease, the lessee would have the right to determine whether a well is producing oil or gas in paying quantities, subject to the rule " . . . that the production must be substantial and sufficient to pay the lessor a royalty justifying the obstruction and interference which he suffers as a result of the occupation and operation on his premises." (citations omitted) 250 S.W. at 976. In affirming the trial court's judgment denying cancellation of the lease, the Court of Appeals stated that it was unable to find any ground of

cancellation " . . . in the absence of a showing that appellant had given notice of his intention to cancel the lease, unless appellee company drilled other wells within a reasonable time or did other necessary development work. No such notice was given." *Id.* at 976. The test of production sufficient to pay the lessor royalty justifying the obstruction and interference with his premises was followed in *Sawyer v. Potter*, 223 Ky. 359, 3 S.W.2d 758 (1928), a case in which the lease did not require production in paying quantities.

In *Warfield Natural Gas Co. v. Allen*, 248 Ky. 646, 59 S.W.2d 534 (1933), the Court of Appeals applied the same test to determine whether a lease continued in effect in a damage suit by a lessor to recover for alleged negligent development of the field by the lessee. The court spoke of a "broad implied provision or covenant" requiring the lessee to proceed with operations and development if oil is discovered in paying quantities, and stated:

> In this jurisdiction production in "paying quantities" as used in this connection is held to mean such quantities as are susceptible of division between the parties and as will yield a royalty to the lessor that justifies the occupancy of and interference with his use of his lands by the operations. (citations omitted). 59 S.W.2d at 538.

In *Cumberland Contracting Co. v. Coffey*, 405 S.W.2d 553 (Ky.1966), the Kentucky Court again dealt with an action by a lessor to cancel an oil and gas lease which had continued beyond its primary term on the basis of a provision "as long thereafter as oil or gas or either of them is produced from said land by the lessee." Though "paying quantities" was not mentioned in the lease the court said that the question was " . . . whether, under the circumstances of this case, the lease should be cancelled because lessee is not producing oil in paying quantities or is only producing enough oil to pay the lessor at most a nominal or token rental. In other words, has the lease expired by its own terms?" (cita-

tions omitted) *Id.* at 555. The court reviewed the earlier cases and restated the rule set forth in *Reynolds v. White Plains Oil and Gas Co., supra.* The court also noted the statement in *Enfield v. Woods, supra,* that an oil well must be one which can be profitably operated to qualify a lease for extension. In affirming, the Court of Appeals stated that reasonable notice had been given before an action for cancellation was filed.

A unique factual situation was presented in *Swiss Oil Corp. v. Riggsby*, 252 Ky. 374, 67 S.W.2d 30 (1934), in that a lessee brought suit to have a lease declared at an end. The leased land contained gas wells only. The extended term of the lease was for as long as oil or gas was found in paying quantities and the court held that the term "paying quantities" had a different meaning when applied to gas production as opposed to oil production. With respect to gas wells the court held that "[t]he term 'paying quantities' is usually defined as being such quantities as will pay a profit, but at least the cost of operating the well. The lessee is not required to market the gas at a loss . . . ." 67 S.W.2d at 31.

We conclude that a mineral lease in Kentucky is extended beyond its primary term pursuant to a "thereafter" clause depending on production of "paying quantities" if oil is produced in sufficient quantities to be susceptible of division and provide the lessor with royalties large enough to compensate for the inconvenience of the lessee's occupancy and operations. *Reynolds v. White Plains Oil and Gas Co., supra.* The testimony of Ernest Brackmier clearly supported a finding of such production. He was called as a witness by the government. When questioned as to the nature of any further proof, counsel for the government "proffered" testimony that Brackmier had operated the two leases at a loss from 1965 to 1970. The District Judge held that such evidence was immaterial in that it did not contradict the testimony of Brackmier. No other proof

was tendered by the government on this issue.

A reading of the various decisions of the Court of Appeals of Kentucky convinces us that the District Judge properly applied the law of Kentucky. So long as a lessor is receiving royalties, "even though small," *Enfield v. Woods, supra,* he may not cancel a lease which provides for continuance beyond its primary term for as long as oil or gas is produced without showing that such royalties are insufficient to compensate him for the occupancy and interference resulting from the operations of the lessee. No proof was offered that royalties had not in fact been paid or that royalties had been paid which were too small to so compensate the lessor. Statements in the various opinions requiring that such leases operate at a profit refer to the necessity that there be enough production to compensate the lessor, not that the lessee show a profit. Many factors other than the size of production can determine the profitability of a particular operation. The government may not avoid paying a lessee of condemned mineral rights by attempting to show that he had operated his leases at a loss. This proof goes to the value, not the existence of a property right, and the district court subsequently permitted evidence of the profitability of the Brackmier operations in the jury trial where value was the issue to be decided.

We do not reach the issue of whether notice of dissatisfaction with the lessee's production is required before a lease may be cancelled during a "thereafter" extension.

Affirmed.