The UPJOHN COMPANY,
Plaintiff-Appellee,

v.

RACHELLE LABORATORIES, INC. and International Rectifier Corporation, Defendants-Appellants.

No. 79–1064.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 9, 1980.

Decided Oct. 21, 1981.

Jon D. Vander Ploeg, Landman, Hathaway, Latimer, Clink & Robb, Muskegon, Mich., Herman F. Selvin, Frank D. Francone, Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Beverly Hills, Cal., for defendants-appellants.

Roger M. Clark, Warner, Norcross & Judd, Thomas F. Koernke, Grand Rapids, Mich., for plaintiff-appellee.

Before KEITH and MARTIN, Circuit Judges, and GORDON,* Senior District Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

International Rectifier Corporation and Rachelle Laboratories, Inc. appeal a breach of contract judgment for $3,446,059.19 in favor of the Upjohn Company. Rachelle, a subsidiary of International Rectifier, is a pharmaceutical manufacturing company. Upjohn is a marketer of pharmaceuticals.

In May, 1971, Rachelle entered into a contract with Upjohn. Upjohn had been searching for a supplier of nitrofurantoin, a generic prescription drug used in the treatment of urinary infections. Prior to the execution of the contract, Upjohn had obtained and tested, to its satisfaction, sample lots of nitrofurantoin crystals and finished nitrofurantoin tablets manufactured by Rachelle. In the contract, Rachelle agreed to manufacture and sell to Upjohn a minimum of fifteen million tablets of the drug per year. The term of the agreement was three years, with an option given to Upjohn to extend the contract for two additional years. International Rectifier, the parent company, guaranteed Rachelle's performance.

The first "production lots" of nitrofurantoin were delivered to Upjohn in late June of 1971. Distribution of the product began shortly thereafter pursuant to Upjohn's "pre-stocking" program. This is essentially a consignment program, in which shipments of the drug are made to drugstores and hospitals, which have the right to return unsold quantities to Upjohn. This method of distribution is utilized because a supply of a drug must be on hand in drugstores and hospitals before doctors can be expected to prescribe the drug.

In October, 1971, Upjohn discovered that the production lots of nitrofurantoin were defective. The drug was not bioavailable— that is, it was not absorbed into the bloodstream. According to Rachelle, the defect was the result of an additional step in the manufacturing process. The final step in manufacturing the precontract lots of nitrofurantoin provided to Upjohn was a wash of the crystals with methanol. In manufacturing the production lots, however, a second methanol wash was added to eliminate a slight vinegar odor. Rachelle contends that the second wash caused a dramatic increase in crystal surface area, which resulted in the bioavailability problem.

The defective tablets were recalled from Upjohn's customers by agreement of the parties. Rachelle offered to replace the recalled material and to deliver bioavailable nitrofurantoin in future installments. Upjohn refused, and informed Rachelle by letter of November 12, 1971 that it no longer wished to purchase nitrofurantoin under the contract.[1] Upjohn then brought this action seeking damages for recall expenses, lost nitrofurantoin sales prior to the recall, lost profits on future sales, and lost profits from sales of related products. The case was submitted to the jury on four theories of liability: breach of contract, breach of

---

* Honorable James F. Gordon, United States Senior District Judge for the Western District of Kentucky, sitting by designation.

1. At trial Rachelle contended that Upjohn breached the contract by refusing to accept further shipments, i. e., that the bioavailability problem with the initial shipments did not "substantially impair" the value of the whole contract. See M.C.L.A. § 440.2612. This issue was submitted to the jury and resolved in Upjohn's favor. It is not raised by Rachelle on appeal.

express warranty, breach of implied warranty of merchantability, and negligence. The jury rendered a verdict in Upjohn's favor, and on a segmented verdict form awarded the following damages: direct expenses of recall—$182,858.19; lost nitrofurantoin sales prior to the recall—$863,201; lost profits for future nitrofurantoin sales—$2,400,000; lost profits from sales of related products—$0. Rachelle and International Rectifier's motion for a judgment notwithstanding the verdict or for a new trial was denied.

On appeal, Rachelle raises several issues, relating both to its liability and to the computation of damages. For the reasons set forth below, we affirm the judgment of the District Court.

## I. Liability Issues.

### A. Contributory Negligence.

Rachelle contends that the trial court erred in failing to instruct the jury that Upjohn would be barred from recovery if it had negligently caused its own losses.[2] According to Rachelle, both Michigan law and Paragraph 14 of the contract require such an instruction. Rachelle asserts that under Michigan law a plaintiff's contributory negligence is a defense to a claim of breach of implied warranty of merchantability. Upjohn, on the other hand, argues that Michigan does not recognize such a defense.

The Michigan cases related to this issue contain some confusing language. Michigan has not adopted the strict liability provision of section 402A of the Second Restatement of Torts. It has, however, adopted a tort theory of product liability which it

calls the "doctrine of implied warranty." *See Piercefield v. Remington Arms Co.*, 375 Mich. 85, 133 N.W.2d 129 (1965); *Bevard v. Ajax Manufacturing Co.*, 473 F.Supp. 35 (E.D.Mich.1979). *Dooms v. Stewart Bolling & Co.*, 68 Mich.App. 5, 241 N.W.2d 738, *lv. denied*, 397 Mich. 862 (1976), a case cited by both parties, involved this doctrine of implied warranty. That theory of liability, however, is not at issue in the present case. *Dooms* clearly holds that contributory negligence is not a defense to a *tort* claim for breach of implied warranty; the issue of a plaintiff's contributory conduct in such a claim "is better directed to the question of proximate cause rather than contributory negligence." *Id.* at 17, 241 N.W.2d at 744.

██ It does not necessarily follow that the same principle applies to a claim of breach of implied warranty of merchantability. The Uniform Commercial Code and other contract-based concepts of Michigan law are inapplicable to a tort action alleging a breach of implied warranty. *Williams v. The Detroit Edison Co.*, 63 Mich.App. 559, 234 N.W.2d 702, *lv. denied*, 395 Mich. 800 (1975). *See also Bevard v. Ajax Manufacturing Co., supra.* Thus, a contract claim brought under M.C.L.A. § 440.2314 requires an independent examination to determine whether or not contributory negligence is a defense.

Rachelle asserts that both M.C.L.A. § 440.2715(2)(b), Official Comment 5, and M.C.L.A. § 440.2314, Official Comment 13, state that negligence in failing to discover defects is a defense to a breach of warranty.[3] We disagree. The first comment is

---

**2.** As part of a series of requested instructions pertaining to Upjohn's implied warranty of merchantability claim, Rachelle asked for the following instruction: "The defendants have claimed that the plaintiff was aware, or should have been aware of the product's defect but nevertheless unreasonably proceeded to place the nitrofurantoin on the market and was damaged by having done so. The defendants have the burden of proving this defense."

**3.** Section 440.2715(2)(b) Official Comment 5 provides:

Subsection (2)(b) states the usual rule as to breach of warranty allowing recovery for in-

juries "proximately" resulting from the breach. Where the injury involved follows the use of goods without discovery of the defect causing the damage, the question of "proximate" cause turns on whether it was reasonable for the buyer to use the goods without such inspection as would have revealed the defects. If it was not reasonable for him to do so, or if he did in fact discover the defect prior to his use, the injury would not proximately result from the breach of warranty.

Section 440.2314, Official Comment 13, provides:

merely an illustration of the meaning of "proximately." *See* J. White & R. Summers, *Uniform Commercial Code*, at 338 (1972). The second indicates only that a showing of proximate cause is an element of a breach of warranty claim. It supports the proposition that the intervening conduct of the plaintiff is relevant to the issue of proximate cause. This has been the approach of the Michigan courts.

Thus, considering the facts in the case at bar we think it no more than an exercise in semantics to quibble over whether the actions of the appellants amounted to an abandonment of their reliance on the seller's implied warranty, or contributory negligence, or indeed whether we should view the trial judge's finding of contributory negligence on the plaintiffs' part as tantamount to a finding of an abandonment by them of their reliance on the implied warranty. The important factor under either theory or an amalgam of them is that, although there have been [sic] a breach of the warranty, that the breach is no longer considered 'the proxi-

In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained. In such an action an affirmative showing by the seller that the loss resulted from some action or event following his own delivery of the goods can operate as a defense. Equally, evidence indicating that the seller exercised care in the manufacture, processing or selection of the goods is relevant to the issue of whether the warranty was in fact broken. Action by the buyer following an examination of the goods which ought to have indicated the defect complained of can be shown.

4. *Michigan Sugar Co. v. Jebavy-Sorenson Orchard*, 66 Mich.App. 642, 239 N.W.2d 693 (1976), does not, as Rachelle contends, compel a contrary conclusion. After a bench trial in that case, the court found that Michigan Sugar had breached its implied warranty of merchantability when it sold sugar containing foreign material to Jebavy-Sorenson. The court further found that Jebavy-Sorenson could not have readily discovered the foreign material in the sugar. Damages were awarded in an amount equal to Jebavy-Sorenson's losses on a contract to sell frozen apples containing the sugar to a third party. The Court of Appeals reversed. It stated that the evidence clearly

mate cause of the loss.' U.C.C. § 2–314, Comment 13. That is, the defect in the set, of which the plaintiffs had knowledge, could no longer be relied upon by them as a basis for an action of breach of warranty.

*Murphy v. Eaton, Yale & Towne, Inc.*, 444 F.2d 317, 327 (6th Cir. 1971), quoting from *Erdman v. Johnson Bros. Radio & Television Co.*, 260 Md. 190, 271 A.2d 744, 749 (Md.App.1970). *See also Buckeye Union Fire Insurance Co. v. Detroit Edison Co.*, 38 Mich.App. 325, 196 N.W.2d 316 (1972).[4]

■ The jury was given the following instruction with respect to the implied warranty claim: [5]

The second element requires that Upjohn prove that it sustained damage as a result of Rachelle's shipment of non-merchantable nitrofurantoin material.

Your verdict will be for plaintiff Upjohn if the material was defective and if in your judgment it caused Upjohn the damages which it seeks in this action. Your verdict will be for the defendants if you find either that plaintiff Upjohn was not

indicated that Jebavy-Sorenson's vice-president and general manager knew that the sugar contained foreign material and knew or should have known that the frozen apples would be rejected. The court held that Jebavy-Sorenson's use of the sugar in these circumstances was "a sufficient intervening act to relieve Michigan Sugar of liability for the damages that followed because of the sugar's use." 66 Mich.App. at 646, 239 N.W.2d 693.

*Michigan Sugar* does not stand for the proposition that a defendant is entitled to a contributory negligence instruction on a claim based on the implied warranty of merchantability. Rather, it is simply a determination that Michigan Sugar's breach of the warranty could not, as a matter of law, have proximately caused Jebavy-Sorenson's injury, and that the trial court's finding to the contrary was clearly erroneous.

5. The trial judge had earlier defined "proximate cause" as follows:

When I use the words "proximate cause" I mean first, that there must have been a connection between the failure of the product to meet the warranty and the injury complained of by the plaintiff, and second, that the occurrence which is claimed to have produced that injury was a natural and probable result of such failure to meet the warranty.

damaged by this shipment of nitrofurantoin material or that the defective material was not a proximate cause of Upjohn's damages.

Rachelle presented evidence at trial that Upjohn knew or should have known of the bioavailability problem but nevertheless proceeded to market the nitrofurantoin. Rachelle was therefore free to argue to the jury that this intervening conduct, rather than the unmerchantable quality of the product, was the proximate cause of Upjohn's damages. This argument would have been consistent with the comments to the Uniform Commercial Code and the cases cited above. Rachelle was not, however, entitled to a separate contributory negligence instruction with respect to this claim. The trial court's refusal to give such an instruction was not error.[6]

■ Rachelle contends that even if Michigan law does not require a contributory negligence instruction with respect to the implied warranty claim, paragraph 14 of the contract does. That paragraph states, in pertinent part, that "[e]ach party shall be responsible for its losses resulting from its own negligence or breach of warranty." As the District Court pointed out, Rachelle reads this provision as a limitation of liability for its breach of the implied warranty of merchantability. In order to be effective, such limitations must comply with the provisions in M.C.L.A. § 440.2316 governing the exclusion or modification of warranties. Those provisions have not been met here, and the trial court correctly submitted the case to the jury on the theory of implied warranty.

## B. The Force Majeure Clause.

■ Rachelle argues that the trial court erred by failing to instruct the jury that

Rachelle would have been excused from performance under the contract if the bioavailability problem was not within its reasonable control. Paragraph 12 of the contract provides:

> Performance of this Agreement by either RACHELLE or UPJOHN shall be excused to the extent that performance is prevented, restricted or interfered with by any of the following causes:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (d) Any other cause whatsoever, whether similar or dissimilar to those enumerated above, beyond the reasonable control of the party.

Rachelle claims that the bioavailability problem was the wholly unexpected result of the second methanol wash. It argues that the jury was entitled to conclude that this unforeseeable circumstance was beyond Rachelle's reasonable control within the meaning of paragraph 12. The trial court refused to submit the issue to the jury. It reasoned that although the bioavailability problem may have been unforeseeable, its cause was a manufacturing decision which was within Rachelle's control. We agree. We find no merit in Rachelle's assertion that the cause of the defect was the equivalent of an act of God to which force majeure clauses traditionally apply. *See, e. g.,* *McLouth Steel Corp. v. Jewell Coal and Coke Co.,* 570 F.2d 594, 608 (6th Cir.), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978).

## C. Limitation of Remedy.

Rachelle contends that there was evidence from which the jury could have found that the parties intended Upjohn's exclusive remedy to be the expense of obtaining replacement drugs from other sources. It

---

6. Rachelle also argues that Upjohn was negligent as a matter of law. We view this as an argument that the defective nitrofurantoin did not, as a matter of law, proximately cause the damages which flowed from its distribution. The defect in the goods in this case was not apparent upon inspection, as was the defect in *Michigan Sugar.* The surface area of the production lot crystals was considerably larger than that of the sample lot crystals. There was

evidence that this fact would be more likely to enhance the bioavailability of the drug than to diminish it. Reasonable minds could certainly disagree as to whether Upjohn knew or should have known of the defect when it distributed the product. We therefore cannot conclude as a matter of law that Upjohn's conduct, rather than the defect, proximately caused Upjohn's damages.

bases this argument on paragraph 13 of the contract, which provides:

> In case a default within the reasonable control of RACHELLE prevents the delivery of the products sold to UPJOHN, other than as provided for in paragraphs 8 or 12, UPJOHN may purchase during the period of such default only the normal quantities of orders not filled by RACHELLE from other sources if RACHELLE does not correct the default and make delivery according to this Agreement within thirty (30) days after notice of default from UPJOHN. If UPJOHN purchases tablets or powder from other sources pursuant to this paragraph and despite the exercise of reasonable diligence [which diligence shall include purchase from other sources meeting FDA and DPSC requirements for tablets or powder but not necessarily RACHELLE's or UPJOHN's specifications referred to in paragraph 3(a)] pays a price in excess of the prices specified in Exhibit "B", RACHELLE shall be responsible for the excess price of the tablets or powder to UPJOHN.

■ The District Court, relying on MCLA § 440.2719(1)(b) and Official Comment 2 to that section,[7] held as a matter of law that paragraph 13 was not an exclusive remedy provision. This conclusion is clearly correct, and Rachelle's argument that this question should have been submitted to the jury is without merit.

■ Finally, Rachelle asserts that the parties intended to exclude the implied warranty of merchantability, and that sufficient evidence was introduced to warrant the submission of that issue to the jury. For the reasons set forth in the District Court's memorandum opinion, we dismiss this argument without further discussion.

## II. Damages Issues.

Rachelle contends that the damages awarded Upjohn are excessive, unsupported by the evidence, and the product of erroneous jury instructions. We will deal separately with each element of the damage award.

### A. Cost of Recall.

Of the total cost of recall damages requested by Upjohn, $123,665.94 was attributable to salesmen's time. A total of 790 Upjohn salesmen visited the pharmacies and hospitals to which the defective nitrofurantoin had been shipped, picked up the pre-stocked quantities, and mailed them back to Kalamazoo, Michigan for destruction. Evidence of the amount of time spent by salesmen in conducting the recall was presented through William Newman, Upjohn's Market Development Manager. Newman referred to a survey of forty salesmen involved in the recall; this survey formed the basis for Upjohn's computation of the recall's cost. Newman did not know how the forty salesmen were chosen, and no evidence was presented which established the statistical reliability of the sample. Newman testified that in his opinion the sample was large enough, and that the survey was a reliable measure of salesman time devoted to the recall.

Rachelle argues that because Newman had no personal knowledge of the survey design, his opinion as to the reliability of the survey could not be an adequate basis for the damage award. It further contends that Newman's opinion was based on hearsay evidence, and is for that reason an inadequate evidentiary foundation for the jury's award of recall damages.

In its opinion on Rachelle's motion for a judgment notwithstanding the verdict or for a new trial, the District Court concluded that Upjohn did not lay a sufficient founda-

---

7. M.C.L.A. § 440.2719(1)(b) provides:

Resort to a remedy as provided [by contract] is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

Comment 2 states:

Subsection (1)(b) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed.

tion to permit the salesman survey to be independently considered by the jury. It also found, however, that Newman's experience as a sales analyst, his knowledge and familiarity with survey techniques, and his statistical and business training qualified him as an expert under Federal Rule of Evidence 702. It concluded that the survey, though inadmissible, was data "of a type reasonably relied upon by experts in that particular field in forming opinions on the subject." Rule 703, Federal Rules of Evidence. This finding was based on Newman's testimony that Upjohn put a large sum of money into survey design and that he had personally done a number of research studies. The court noted that Newman was available for cross-examination into his qualifications as an expert and the propriety of using the survey data in forming his opinion. It concluded that the presentation of the survey data through Newman as an expert witness remedied the evidentiary shortcomings of the survey alone. The court agreed with Rachelle that the survey itself should not have been admitted into evidence, but concluded that any prejudice resulting therefrom was insignificant.

■ We find no error in the submission of this damage issue to the jury on the evidence in the record. Rachelle has never contested the fact that Upjohn incurred a loss in the recall of the nitrofurantoin. The District Court was acutely aware of the legal problems attendant upon the use of survey evidence in establishing the amount of that loss. We find that it did not abuse its discretion in holding that the survey was the type of data reasonably relied upon by experts in the field in forming opinions such as that offered by Newman. *See United States v. 2,847.58 Acres of Land*, 529 F.2d 682, 685 (6th Cir. 1976). The court correctly determined that the weaknesses of the factual basis of Newman's opinion should bear on the weight of the evidence rather than its admissibility. *See Taenzler v. Burling-*

ton Northern, 608 F.2d 796, 798, n.3 (8th Cir. 1979).

### B. Lost Profits on Future Sales.

■ We note at the outset that Upjohn was clearly entitled to seek damages for lost profits from future sales of nitrofurantoin. The question in this case is whether the evidence was sufficient to submit the claim for anticipated lost profits to the jury.

Upjohn's proof of lost profits was illustrated by the following chart.[8]

FUTURE PROFIT LOSS ON NITROFURANTOIN
ADD (OOO)

| | 1971 Nov. | Dec. | Tot. 1971 | 1972 | 1973 | 1974 | 1975 | Tot. 5 Yr. |
|---|---|---|---|---|---|---|---|---|
| Sales Forecast | 40 | 40 | 80 | 1200 | 1200 | 1200 | 1200 | 4880 |
| Cost of Goods | 6 | 6 | 12 | 180 | 240 | 240 | 240 | 912 |
| Gross Profit | 34 | 34 | 68 | 1020 | 960 | 960 | 960 | 3968 |
| Non-Salesmen Promotion | | | | 120 | 120 | 120 | 120 | 480 |
| Net Profit | 34 | 34 | 68 | 900 | 840 | 840 | 840 | 3488 |

Most of the information contained in the exhibit was derived from a New Product Proposal prepared by Upjohn in 1971 in anticipation of entering the nitrofurantoin market. The proposal was prepared by Paul Riggs, Manager of the Mass Marketing Department within Upjohn's Domestic Pharmaceutical Marketing Division. The District Court gave the following description of the proposal, based on Riggs' testimony at trial:

This was a study analyzing with some depth the state of the overall market for the particular drug under consideration, the economic environment in which the drug had to be marketed, production and/or product costs, promotional expenses, profitability potential, and other factors deemed significant in assessing the prospects for successful marketing of the proposed product. The statistics contained in the new product proposal were derived from various surveys and projections prepared by trained personnel at Upjohn. These projections covered a five-year period, and were periodically revised to reflect unanticipated changes in

8. Upjohn also produced a second computation of lost profits, based on the minimum purchase requirements of the contract and certain cost data derived from various exhibits. This com-

putation was also subjected to detailed scrutiny during the cross-examination of Riggs by Rachelle.

the market picture. New product proposals were the basis for Upjohn's decisions to market new drugs, and millions of dollars were invested in accordance with the projections.

Rachelle contends on appeal that Riggs was unable to cite sufficient factual data at trial to support the sales forecasts contained in the New Product Proposal. It further asserts that there is no factual basis for the profit projections based on those forecasts. Finally, it claims that Upjohn failed to prove that it deducted all of its expenses from lost sales or that the expenses not deducted were not saved.

■ The trial court found that Upjohn's proof was clearly sufficient under *Fera v. Village Plaza, Inc.*, 396 Mich. 639, 242 N.W.2d 372 (1976), to warrant the submission of the lost profits claim to the jury. We agree.

The plaintiffs in *Fera* were lessees of space in the defendant's proposed shopping center. By the time the space was ready for occupancy, the defendant had lost the lease and rented the space to other tenants. Plaintiffs brought an action seeking anticipated lost profits from their planned business venture and obtained a jury verdict for $200,000. The Michigan Court of Appeals reversed, holding that the trial court erroneously permitted the recovery of lost profits. The Michigan Supreme Court again reversed and reinstated the original judgment. It adopted the theory that a new business could recover damages for lost profits from the breach of a lease. Addressing the argument that the proof of lost profits was entirely speculative, the court quoted approvingly from the opinion of the trial court. The trial judge noted that there were days and days of testimony from experts on each side on the issue of lost profits, and that the jury's award was well within the range of proofs. The Michigan Supreme Court concluded the proof was sufficient to warrant submission of the issue to the jury. In describing the scope of appellate review in examining jury awards for lost profits under Michigan law, the court stated:

As [the trial court] observed, the jury was instructed on the law concerning speculative damages. The case was thoroughly tried by all the parties. Apparently, the jury believed the plaintiffs. That is its prerogative.

The testimony presented during the trial was conflicting. The weaknesses of plaintiffs' specially prepared budget were thoroughly explored on cross-examination. Defendants' witnesses testified concerning the likelihood that plaintiffs would not have made profits if the contract had been performed. There was conflicting testimony concerning the availability of a liquor license. All this was spread before the jury.

\* \* \* \* \* \*

The trial judge, who also listened to all of the conflicting testimony, denied defendants' motion for a new trial, finding that the verdict was justified by the evidence. We find no abuse of discretion in that decision. *Sloan v. Kramer-Orloff Co.*, 371 Mich. 403, 124 N.W.2d 255 (1963). 'The trial court has a large amount of discretion in determining whether to submit the question of profits to the jury; and when it is so submitted, the jury will also have a large amount of discretion in determining the amount of its verdict.' 5 Corbin on Contracts, § 1022, pp. 145–146.

\* \* \* \* \* \*

While we might have found plaintiffs' proofs lacking had we been members of the jury, that is not the standard of review we employ. 'As a reviewing court we will not invade the fact-finding of the jury or remand for entry of judgment unless the factual record is so clear that reasonable minds may not disagree.' *Hall v. Detroit*, 383 Mich. 571, 574; 177 N.W.2d 161 (1970). This is not the situation here.

396 Mich. at 647–48, 242 N.W.2d 375–76. *See also The Vogue v. Shopping Centers, Inc.*, 402 Mich. 546, 266 N.W.2d 148 (1978), *on remand*, 86 Mich.App. 110, 272 N.W.2d 205 (1978).

The amount of Upjohn's lost profits could not have been established with absolute certainty. There is inevitably an element of uncertainty in determining the future profitability of an enterprise which only existed briefly. Our role is to determine whether reasonable minds could disagree as to the adequacy of the proof of Upjohn's lost profits. *The Vogue v. Shopping Centers, Inc.*, supra, 266 N.W.2d at 151.

We agree with the District Court's assessment of the lost profits evidence. Upjohn's proof was based on marketing forecasts prepared well before litigation was anticipated, by employees specializing in economic forecasting. Riggs had clearly qualified as an expert by reason of his marketing and strategic planning experience. The accuracy of the projections was extensively litigated, and Rachelle presented its own proof concerning the proper calculation of lost profits. The trial court instructed the jury that the law does not permit pure guesswork or speculation as to damages. As for the expenses saved by the breach, the jury was instructed that Upjohn had "the burden of proving that it has deducted its costs from the sales forecasts to arrive at projected profit or to prove that it could not have saved any of the costs." Finally, the jury's award was well within the range established by the evidence. This indicates, as the trial court pointed out, that the jury made its own assessment of the weight of the evidence.

The *Fera* and *The Vogue* decisions of the Michigan courts require us to give considerable weight to the opinion of a trial judge who finds that a verdict for lost profits was justified by the evidence. We find the District Court's decision in this matter to be amply supported by the facts in the record.

### C. Lost Sales Prior to the Recall.

The jury awarded $863,201.00 for lost sales of nitrofurantoin before the recall. This figure represents the sale price for the quantities of the drug delivered to Upjohn's customers pursuant to the pre-stocking plan. Rachelle makes two arguments with respect to this element of the damage award. First, it claims that these damages are based on the erroneous assumption that all the pre-stocked quantities of the drug would be resold by the drugstores and hospitals. It points out that Upjohn's customers had the right to return the unused quantities of the drug, and that some had already exercised that right prior to the recall.

We agree with the District Court's conclusion that it does not matter whether these "lost sales" were in fact merely lost prospective sales. The issue is whether there was sufficient evidence to submit the question to the jury. Upjohn's evidence on this claim consisted of the sales invoices for the four months during which the drug was distributed. Rachelle countered with evidence suggesting that Upjohn could not have reasonably expected to sell all of the pre-stocked quantities of the drug. The issue, like all the damage issues in this case, was tried thoroughly by the parties. "Apparently, the jury believed the plaintiffs. That is its prerogative." *Fera v. Village Plaza, Inc.*, supra, 396 Mich. at 647, 242 N.W.2d at 375.

Rachelle's second argument with respect to this issue is that Upjohn was erroneously permitted to recover the full sales price of the nitrofurantoin it distributed, rather than its net profit from those sales. It is, of course, a fundamental tenet of contract law that the purpose of damages is to compensate the aggrieved party for injury caused by the breach. *See McAlpine v. AAMCO Transmissions*, 461 F.Supp. 1232, 1281 (D.Mich.1978); *Tel-Ex Plaza v. Hardees Restaurants, Inc.*, 76 Mich.App. 131, 255 N.W.2d 794, *lv. denied*, 402 Mich. 832 (1977). Upjohn contends that damages in the amount of the full sales price were necessary to achieve this goal. It bases this assertion on the fact that it had credited to its customers the sales price of the nitrofurantoin because of the recall and had incurred all the expenses associated with the distribution of the product. Upjohn further asserts that Rachelle has not refunded the purchase price of the defective nitrofurantoin. Upjohn concludes that the only way for it to recover its profit from these lost sales is to be awarded the full purchase price.

Rachelle does not directly contest this argument. It simply states that the standard measure of damages in this situation is net profits, and argues that Upjohn expressly disclaimed at trial its right to recover the full sales price. This latter contention is based on an exchange between the court and counsel for Upjohn. It occurred after the court addressed the jury in response to its request for clarification of the instructions, which pertained to the *fourth* category of damages—the loss of profits from sales of other Upjohn products. To ensure that the jury considered all of the instructions relating to that category of damages, the trial court reviewed that page in the context of the instructions as a whole. After the jury was excused, the following colloquy took place:

> Mr. Clark [counsel for Upjohn]: I have one point, and I did not pick it up before, and this may be the source of the confusion, I don't know. If you look at page 28, in the last full line, it says, it refers to the lost sales and that should really be profits. We are not claiming lost sales, and that may be it, because in Category 2 we were talking about sales, and I would be perfectly agreeable to having that corrected, and if that's the source of the problem, fine. If it's not, why, the correction will do no harm.
>
> The Court: All right. Did you have anything further?
>
> Mr. McNally [counsel for Rachelle]: I have nothing to say, your Honor.
>
> The Court: All right, we will look at that. You might have a point there....

This "disclaimer" by Upjohn clearly pertained only to the claim of damages for lost profits on *related* drugs. Counsel was explicitly addressing the reference on page 28 to Upjohn's "claimed lost *sales* on the four other drugs," (emphasis added), and noted that his client sought only the *profits* from those lost sales. Nothing was done about the misleading instruction because the jury chose to award no damages on that particular issue.

Rachelle's contention that Upjohn "unequivocably disclaimed" the damage award for lost sales of nitrofurantoin prior to the recall is without merit. No such interpretation of the above-quoted statement is reasonable; indeed, we believe that Rachelle's treatment of this issue amounts to a misrepresentation of the record. Rachelle did not object to the trial court's instruction that Upjohn sought damages for lost nitrofurantoin sales. Nor did it specifically object to the use of the phrase "lost nitrofurantoin sales" on the verdict form submitted to the jury. Finally, no mention of this issue was made in Rachelle's post-trial motion for a judgment notwithstanding the verdict or for a new trial.

To conclude, Rachelle has failed to address directly Upjohn's contention that the full invoice price of the recalled nitrofurantoin was the amount necessary to give Upjohn the benefit of its bargain. Even if it had, its failure to raise the issue below would have precluded our consideration of it on appeal. Rule 51, Federal Rules of Civil Procedure.

The judgment of the district Court is affirmed.