660 F.2d 208
 UNITED STATES of America, Plaintiff-Appellee,
v.
103.38 ACRES OF LAND, MORE OR LESS, SITUATED IN MORGAN
COUNTY, COMMONWEALTH OF KENTUCKY; Frank D.
Oldfield; Doris Oldfield; and Addington
Brothers Mining Company,
Defendants-Appellants.
 No. 79-3165.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 13, 1980.
Decided Oct. 6, 1981.
 
 Henry R. Wilhoit, Jr., Wilhoit & Wilhoit, Grayson, Ky., for Frank and Doris Oldfield.
 C. F. Bagley, Robert K. Emerson, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, W.Va., for Addington Bros. Min.
 Patrick H. Molloy, U.S. Atty., Lexington, Ky., James W. Moorman, Carl Strass, Joshua I. Schwartz, Lands and Natural Resources Div., U.S. Dept. of Justice, Laura Frossard, Anthony C. Liotta and Edward J. Shawaker, Washington, D.C., for the United States.
 Before EDWARDS, Chief Judge, BOYCE F. MARTIN, Jr., Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 This case requires us to review the methods of property valuation which may properly serve as the basis of an award in federal eminent domain proceedings. Specifically, we must examine the types of evidence the trier of fact should consider in determining the value of condemned mineral-bearing property.
 
 
 2
 We are concerned with a 103-acre tract of unimproved land, purchased by appellants Frank and Doris Oldfield in 1968. The property, located in eastern Kentucky, overlies a portion of the Van Lear coal seam, an important source of high quality, low sulphur coal. In 1973, the Oldfields leased the tract for mining purposes to appellant Addington Brothers Mining Company. The specified royalty rate was $.35 per ton. In February, 1976, this lease was "renewed" and the royalty raised to $2 per ton. In December, 1976, after Addington had obtained mining permits but before he had begun actual mining operations, the United States condemned the property for a Corps of Engineers flood control project.
 
 
 3
 The District Court conducted a bench trial on the issue of compensation in August, 1978. The Oldfields and Addington elected to proceed as if a single party had owned the property in fee prior to the taking; any division of the award was left to private agreement. Thus, the sole question was the value of the tract on the date of condemnation.
 
 
 4
 The parties agreed that the highest and best use of the land was mineral extraction. It was also undisputed that a ready market existed for Van Lear coal. Estimates of the quantity of coal recoverable from the tract ranged from 52,000 to 83,000 tons.
 
 
 5
 In valuing the property, the government, through its expert witnesses Donan and Robinson, relied exclusively on a "market data" or "comparable sales" approach. This method fixes the value of a condemned tract by reference to recent sales of allegedly "comparable" properties in the vicinity. On the basis of several such sales, Donan and Robinson appraised the Oldfield parcel at $40,000 and $32,000, respectively.
 
 
 6
 The owners, however, take the position that none of the sales cited by the government involved properties which were truly "comparable" to the condemned tract. They contend they established this position by cross-examining the government's witnesses. Because the government did not offer sufficiently probative "comparable sales" evidence, the owners urged the District Court to use an alternate method of valuation, which we will call a hypothetical cash flow analysis.
 
 
 7
 The proponent of this approach, expert witness J. W. Straton, attempted to establish the present value of the coal in place by projecting the cash flow which would be generated by surface mining all the coal. Beginning with the undisputed railhead price of $28.00 per ton, Mr. Straton estimated production costs of $17.51 per ton for the combined stripping and augering operation required to exhaust the coal deposit. This would leave an operating margin after adjustment for taxes and depreciation recapture of $12.06 per ton. Assuming that any operator mining the tract would require a 25 percent return on his investment, Mr. Straton determined that $4.33 of the operating margin would be taken as profit. This would leave $7.73 per ton which the operator could pay to the landowner for the right to extract the coal. At this point, Mr. Straton opined that a willing buyer-operator and a willing seller-landowner would negotiate a two-thirds to one-third division of the $7.33 margin so that the landowner would receive a royalty of $5.16 per ton of coal recovered. Multiplying that figure by an estimate of 68,300 tons of recoverable minerals in place and discounting the result to be paid over a 16-week period by an unspecified discount multiplier, Mr. Straton arrived at a value of $331,510.00 for the coal in place on the date of condemnation. Apparently, the owners do not contend that the Oldfield tract had any value over and above the value of the mineral deposit itself.
 
 
 8
 The District Judge, in a memorandum opinion, concluded that neither party had succeeded in establishing the value of the condemned property. He found as a fact that none of the sales cited by the government were sufficiently "comparable" to be probative of value. On the other hand, he declined to rely on the owners' cash flow formula because its cost components were, inevitably, highly speculative in nature. Thus, despite his express conviction that the condemned property was in fact worth considerably more than the government's figure, the District Judge held that the evidence before him could not support an award greater than $40,000, the government's higher appraisal. Accordingly, he entered an award in that amount and recommended that the parties appeal his decision.
 
 
 9
 On appeal, the owners concede that "comparable sales" normally constitute the best evidence of value. They assert, however, that mineral-bearing properties are too unique for valuation by analogy to other tracts. Under these circumstances, they contend, Mr. Straton's cash flow method is a "rational" approach to the valuation problem and should have been adopted by the District Court. As a secondary argument, they suggest that the royalty rate of $2 per ton specified in the renewed Oldfield-Addington lease would have yielded a royalty of about $136,000 had the condemnation not foiled Addington's plan to mine the coal. They argue that this figure points up the inadequacy of the $40,000 award.
 
 
 10
 The United States offers several arguments to support the award below. It claims: first, that the District Court erred in finding that the sales offered in evidence were not "comparable," second, that the owners' method is too speculative to support an award; and third, that the value of a resource in place may never be established by multiplying the amount of miner recoverable by a fixed price per unit.
 
 
 11
 We begin our discussion with a brief general summary of the applicable law. The Fifth Amendment guarantees "just compensation" for private property taken for public use. "Just compensation" means that the former owner must be returned to the monetary position he would have occupied had the taking not occurred. To achieve this monetary equivalence, the former owner is entitled to the "fair market value" of his property at the time it is condemned. "Fair market value" is to be determined from "what a willing buyer would pay in cash to a willing seller." Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 473-74, 93 S.Ct. 791, 794-795, 35 L.Ed.2d 1 (1973), and cases cited therein.
 
 
 12
 A "comparable sales" analysis has long been and remains the preferred method of establishing a property's "fair market value." See, e. g. United States v. 2,847.58 Acres of Land, 529 F.2d 682 (6th Cir. 1976); Welch v. Tennessee Valley Authority, 108 F.2d 95 (6th Cir. 1939), cert. denied, 309 U.S. 688, 60 S.Ct. 889, 84 L.Ed. 1030 (1940). Nothing in this opinion is intended to cast doubt on that method of analysis. Nevertheless, we must recognize that its validity depends upon the notion of "comparability," which "while it does not mean identity, because each parcel of real property differs from every other parcel, does mean, at the very least, similarity in many respects." Fairfield Gardens, Inc. v. United States, 306 F.2d 167, 172-73 (9th Cir. 1962). In the usual case, in which sales satisfying this test of "comparability" are introduced in evidence, the conventional method of valuation presents no problems. In the absence of true "comparables", however, the trier of fact may indeed must resort to other means of determining fair market value. United States v. 2,847.58 Acres of Land, supra; Welch v. Tennessee Valley Authority, supra.
 
 
 13
 In 2,847.58 Acres of Land, this court upheld a jury award of compensation for mineral interests in condemned oil producing land. At trial the government witnesses had testified that they knew of no comparable sales to use as a basis for appraising the oil deposits. Similarly, no comparable sales were cited by the owners' expert witnesses. However, they testified that an active market for unrecovered oil existed, and that a willing buyer would pay a willing seller about $1 per barrel for the oil in place. On appeal, the government contended that the jury should not have been permitted to base an award on evidence of this nature. We disagreed, indicating that the trier of fact may, in the absence of "comparable sales", rely on the testimony of expert witnesses whose method of valuation can be related to actual market practices.
 
 
 14
 We see no reason to distinguish as a matter of law between 2,847.58 Acres of Land, in which no "comparable sales" evidence was introduced, and the present case, in which the trial judge found as a fact that the government's comparable sales testimony lacked probative value. The need for another means of valuation is equally great whether the preferred type of evidence is totally absent or merely totally unpersuasive.
 
 
 15
 In this context, we will not disturb the District Court's finding that the sales cited by the United States were not "comparable" for the purpose of valuing the condemned tract. Our review of the record indicates that there are significant differences between the high quality Van Lear coal located on the Oldfield land and the inferior Fire Clay coal underlying two of the three tracts offered for comparison by government witness Donan. Furthermore, government witness Jeter apparently failed to obtain chemical data on the coal contained in any of the allegedly comparable properties he considered. As a result, he could not make informed comparisons with the Oldfield mineral. Similar objections discredit the testimony of Mr. Robinson. In short, we believe substantial evidence supports the District Court's finding.
 
 
 16
 Having decided that this is an appropriate case for valuation by some standard other than "comparable sales," we must determine whether the owners' cash flow analysis is an appropriate alternative. It is self-evident that the trier of fact's goal in estimating "fair market value" is maximum accuracy. It is also apparent that the further removed from the actual marketplace evidence of value becomes, the more speculative and uncertain the resulting valuation must be. This premise, of course, underlies the strong judicial preference for comparable sales evidence. This premise must also guide our ruling on the owners' cash flow approach.
 
 
 17
 We recognize that any attempt to place a value on property containing minerals in place must take into account more variables and unknown factors than, for instance, the appraisal of a suburban residence. United States v. Silver Queen Mining Co., 285 F.2d 506 (10th Cir. 1960). Nevertheless, the degree of speculation can and should be minimized.
 
 
 18
 Before we consider the substantive issue in detail, we point out what we perceive to be the central problem for the trier of fact in cases of this nature. The "highest and best use" of the land being taken is indisputably mineral extraction. If either party had submitted probative evidence of truly "comparable sales," it might have been unnecessary to appraise the mineral deposit as an entity separate from the tract as a whole. Presumably, the value of the coal in place would be fully reflected in the sale price of comparable properties. Regrettably, no probative comparable sales evidence was forthcoming. As a result, the trier of fact had no comprehensive "yardstick" of value on which to base an award. Under these circumstances, the logical first step in valuing the land is to determine the value of the mineral in place. This is what the owners' cash flow analysis purports to do.
 
 
 19
 The trier of fact must be aware, however, that the value of the mineral deposit itself may or may not be substantially equivalent to the value of the mineral bearing property as a whole. Although the valuation process may begin with computation of the former, the ultimate award must be based upon the latter. See Cade v. United States, 213 F.2d 138 (4th Cir. 1954). The trier of fact must, of course, decide based on the evidence in each case whether the entire property is worth more than, the same as, or even less than the mineral it contains. This issue was neither briefed nor argued in this appeal. We therefore decline to develop definitive rules to integrate separate elements of value into a single figure until the problem surfaces in a more appropriate case. We do note, however, a recent Eighth Circuit decision which offers some insight into the case-by-case application of the so-called "unit rule," United States v. 91.90 Acres of Land, 586 F.2d 79 (1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979).
 
 
 20
 We turn now to the crux of the present dispute. The owners' cash flow analysis, described earlier, rests on two distinct hypotheses. The first is that the fair market value of a coal deposit is determinable by multiplying the recoverable tonnage of mineral by a given royalty per ton, and by discounting the sum thus obtained to present value. Under limited circumstances, set out below, we agree with this premise. However, we reject the owners' second hypothesis that the royalty rate utilized in the above computation of value should be fixed with reference to a putative operator-lessee's projected cash flow, in favor of a less speculative standard.
 
 
 21
 A. Royalty Capitalization.
 
 
 22
 In the absence of probative comparable sales, we believe that some form of royalty capitalization is an appropriate means of valuing the mineral deposit located on the Oldfield land. As we have already observed, the goal of the trier of fact in eminent domain proceedings is to duplicate marketplace calculations to the greatest possible extent. Valuation evidence based on royalty capitalization will further this purpose if, and only if, the offering party can establish: 1) that an active market exists for the mineral in place; 2) that transactions between willing buyers and sellers in that market commonly take the form of royalty payments; and 3) that the figures on which an award might be based represent the conclusions of an industry expert. See 2,847.58 Acres of Land, supra. If all these conditions are satisfied and they clearly are in this case the trier of fact should be able to approximate the sum a landowner could reasonably expect to receive for his mineral on the open market at the time of the taking.
 
 
 23
 We have not found a recent federal court opinion which squarely addresses this question. However, the use of some form of royalty capitalization for valuing a mineral deposit finds implicit sanction in several decisions. In 2,847.58 Acres of Land, this court upheld a condemnation award based, at least in part, on expert testimony that oil in place had a "fair market value" of $1 per barrel. In United States v. 91.90 Acres of Land, an expert witness for the government valued a clay deposit by multiplying the estimated recoverable tonnage in place by a "reasonable royalty" and discounting the product to present value. This valuation method which the United States disputes in the present case drew no criticism from the Eighth Circuit. In United States v. 180.37 Acres of Land, 254 F.Supp. 678 (W.D.Va.1966), a coal land condemnation case, the government appealed a Commissioner's award based on the capitalization of royalties. The District Court, noting the absence of comparable sales evidence, affirmed the Commissioner's award.
 
 
 24
 The United States offers two objections to any formula requiring the multiplication of a royalty rate by the estimated recoverable tonnage of coal in place. First, it contends that the royalty approach is "too speculative;" it points out the impossibility of determining before actual mining, precisely how much recoverable coal a tract contains and whether it could in fact be mined profitably. These uncertainties are undeniable. However, as the Supreme Court stated a number of years ago in a case involving the condemnation of a mining claim by a railroad:
 
 
 25
 Until there has been full exploiting of the vein its value is not certain, and there is an element of speculation, it must be conceded, in any estimate thereof. And yet, uncertain and speculative as it is, such prospect has a market value, and the absence of certainty is not a matter of which the railroad company can take advantage when it seeks to enforce a sale.
 
 
 26
 Montana Railway Company v. Warren, 137 U.S. 348, 352, 11 S.Ct. 96, 97, 34 L.Ed. 681 (1890). More recently, the Tenth Circuit, citing Montana Railway, commented on the difficulty of determining the fair market value of mineral bearing property:
 
 
 27
 Some speculation is inherent in the ascertainment of value of all resource property, be it mineral, oil, gas or otherwise, and if the quality of proof of value follows the custom of the industry, is the best available, and is sufficient to allow the jury or court to make an informed estimate as to the fact of value, such proof is sufficient to meet the burden.
 
 
 28
 United States v. Silver Queen Mining Company, supra, at 510. Under the circumstances of the present case, we conclude that some form of royalty capitalization is the best if not the only rational means of valuing the Oldfield coal deposit. See United States v. 180.37 Acres of Land, supra.
 
 
 29
 In a second, related argument, the government relies on language from several cases which appear to forbid the use of a "units X price" valuation formula: United States v. 91.90 Acres of Land, supra; Mills v. United States, 363 F.2d 78 (8th Cir. 1966); United States v. Sowards, 370 F.2d 87 (10th Cir. 1966); United States v. Pennsylvania-Dixie Cement Corp., 178 F.2d 195 (6th Cir. 1949). We discussed Mills and Sowards in the context of this issue in 2,847.58 Acres of Land, and merely repeat our conclusions here. Those cases do not stand for the proposition that the "units X price" formula is never competent evidence in federal condemnation actions. They forbid that method of valuation only if: 1) no market for mineral in place is established; or 2) the valuation witness lacks the requisite industry expertise. Here, we have already observed that neither of those conditions is present.
 
 
 30
 The citation of Pennsylvania-Dixie Cement Co. and 91.90 Acres of Land adds nothing to the government's argument. In Pennsylvania-Dixie Cement Co., the United States appealed a jury award to the lessee of a condemned sand pit. The lessee, a cement company that lost the use of the sand as a result of the taking, was awarded a sum representing the replacement cost of the sand. This court remanded the case for a new trial with instructions to determine the "fair market value" rather than the replacement cost of the sand. It should be clear without further elaboration that Pennsylvania-Dixie Cement Co. is simply inapposite to the present controversy.
 
 
 31
 91.90 Acres of Land contains language critical of "units X price" valuation. In the context of that case, however, it is apparent that the Eighth Circuit was referring to the landowner's efforts to obtain an award based on tonnage of clay in place multiplied by the market value of the clay after extraction. In other words, that language would apply to the present case only if the owners had argued that their coal deposit was worth the railhead price of $28 per ton multiplied by the estimated tonnage in place. Inasmuch as the owners have never suggested valuation of their coal by such a formula, the government's reliance on 91.90 Acres of Land is misplaced.
 
 
 32
 B. The Royalty Rate.
 
 
 33
 Having determined that some form of royalty capitalization is an acceptable means of valuing the Oldfield coal deposit, we must now determine the royalty rate. Mr. Straton's cash flow analysis is apparently patterned on a model of mineral valuation recommended in the U. S. Bureau of Mines' Publication Number 8422. It is, as the District Court observed, a "rational" method which no doubt has a variety of useful applications within the coal industry. In our judgment, however, this approach is ill-suited to the purposes of eminent domain proceedings.
 
 
 34
 Again, we emphasize that a condemnation award must reflect a property's fair market value. In this case, the trier of fact must ascertain the value of the Oldfield coal in the actual market for mineral in place. The fatal flaw in the owners' cash flow method is its lack of demonstrable relationship with this "real" market in coal royalties. In order to validate the cash flow approach in our eyes, the owners would have to establish that royalty rates are in fact fixed in the marketplace by a process which parallels Mr. Straton's calculations. All the evidence below, however, points to a contrary conclusion.
 
 
 35
 Our review of Mr. Straton's methodology indicates that his figure of $7.33 per ton represents the sum a coal operator could hypothetically afford to pay for the privilege of mining the Oldfield tract without sacrificing a reasonable return on his investment. Mr. Straton's final step was to split this excess profit margin, two-thirds to one-third, between landowner and coal operator. This division was based on Mr. Straton's "knowledge of the coal industry," without additional explanation. Mr. Straton's expertise is not at issue. We do, however, note that he could not cite a single instance of such a coal royalty negotiation. He also admitted that the calculations he actually performed for his clients generally involved a given royalty rate, factored into the cost computation, in order to protect the total return to the operator.
 
 
 36
 Testimony introduced by the United States further militates against uncritical acceptance of the method that produced a royalty rate of $5.16 per ton. Mr. Donan indicated that in his search for "comparable sales" in the vicinity of the Oldfield property, he examined the courthouse records of about fifty coal tracts which were subject to mineral leases. In each instance, he testified, the lease called for royalties at the rate of $2 per ton. This evidence strongly suggests a "going rate" in the marketplace instead of the individually negotiated rate Mr. Straton's method employs.
 
 
 37
 In summary, we believe that probative evidence of a coal deposit's "royalty value" must be defined as evidence derived from or demonstrably related to the actual market in mineral royalties. On the basis of the record below, we conclude that the owners' cash flow analysis lacks these essential characteristics.
 
 
 38
 One final question remains. At the pre-trial conference, a transcript of which is part of the record on appeal, the District Judge indicated that he would not accept as evidence of value the $2 per ton royalty rate in the second Oldfield-Addington lease. Inasmuch as the original lease was "renewed" in 1976, after the impending condemnation had become common knowledge, his hesitation to rely on this evidence is understandable. Nevertheless, we believe that the owners should have been given an opportunity to demonstrate that the new rate was the product of a bona fide renegotiation based on rising values in the open market. If they can establish that a royalty of $2 per ton constituted "fair market value" at the time of the taking, there can be no serious objection to the trier of fact's use of this information in reaching an award.
 
 
 39
 The judgment of the District Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.