UNITED STATES of America,
Plaintiff–Appellee,

v.

L.E. COOKE COMPANY, INC.,
Defendant–Appellant.

No. 92–5749.

United States Court of Appeals,
Sixth Circuit.

Argued March 23, 1993.

Decided April 20, 1993.

**338**

Karen K. Caldwell, U.S. Atty., Office of the U.S. Atty., Lexington, KY, and Jacques B. Gelin, and Evelyn S. Ying (argued and briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, for plaintiff-appellee.

James H. Moore, III (argued and briefed), Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Ashland, KY, and James R. Bailes, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, WV, for defendant-appellant.

Before: KENNEDY, MARTIN and MILBURN, Circuit Judges.

MILBURN, Circuit Judge.

Defendant L.E. Cooke Company, Inc. ("Cooke") appeals the district court's judgment awarding it $65,000 as just compensation for the United States Government's taking of mineral rights to certain tracts of land located in Lawrence County, Kentucky. The issues presented on appeal are (1) whether the district court erred in admitting the expert testimony of Samuel Fish, (2) whether the trial court's denial of the motion to strike Fish's alleged improper and confusing testimony prejudiced the defendant requiring a new trial, and (3) whether the jury's verdict was against the weight of the evidence. For the reasons that follow, we affirm.

## I.

### A.

The United States brought a consolidated civil action to condemn land through its power of eminent domain in order to acquire title to certain tracts of land located in Lawrence County, Kentucky, and to award just compensation for the taking to the owners and parties-in-interest. The land was to be acquired by the United States at the request of the U.S. Army Corps of Engineers for the purpose of constructing Yatesville Lake on Blaine Creek, Kentucky, in connection with and as part of a comprehensive plan for flood control in the Ohio River Basin. A condemnation proceeding of this type is authorized by 33 U.S.C. §§ 591 and 701 and 40 U.S.C. § 258a.

A hearing was held on November 14, 1990, before a magistrate judge in order to determine ownership of the coal lease interests in the subject tracts. The magistrate judge's report, issued November 26, 1990, recommended that judgment be entered declaring the ownership of the coal leases in defendant Cooke and that all other party defendants be dismissed. After a de novo review, the district court entered judgment

in accordance with the magistrate judge's report and recommendation on December 12, 1990.

On March 9 and 10, 1992, a jury trial was held with the sole issue being the determination of the total fair market value of the Cooke coal leases as of the date of taking. The date of taking was stipulated as December 6, 1989. Four expert witnesses testified—one for Cooke and three for the United States—and offered opinions of fair market value ranging from $41,518 to $427,000. After deliberation, the jury returned a verdict finding the fair market value of the coal leases on the date of taking to be $65,000. The district court entered judgment pursuant to the jury's verdict and denied Cooke's motion for a new trial. This timely appeal followed.

### B.

Because Cooke had the burden of persuasion in this action, its expert witness, John Praskwiecz, testified first. Praskwiecz, a licensed mining engineer, regularly performs reserve studies, mine feasibility studies, and appraisals for his employer, Gaddy Engineering Company. Praskwiecz had nearly 14 years of experience with Gaddy Engineering at the time of trial. The majority of his work has been in southern West Virginia and eastern Kentucky, and he testified that he was familiar with the Lawrence County coal fields. At Cooke's request, Praskwiecz performed a reserve study of all the Cooke-leased tracts that had been condemned for the Yatesville Lake Project.

Praskwiecz testified that reserve evaluations involve a determination of the amount of coal that is mineable and merchantable within a given piece of property and that mine feasibility studies are economic studies to determine the cost of mining coal, such as the selection of equipment and method of mining. The coal industry categorizes reserves according to standards established by the United States Geological Survey. Praskwiecz testified that such reserves are either proven, i.e., one-quarter mile from a known point of coal thickness; probable, i.e., one-quarter to three-quarters

of a mile from that point; inferred, i.e., three-quarters of a mile to one and one-half miles from that point; or potential, i.e., over one and one-half miles from the known point of coal.

After explaining the procedures he used and the sources of information he relied upon, Praskwiecz concluded that the tracts at issue contained 47,000 tons of proven coal and 1,066,000 tons of probable coal, for a total of 1,113,000 tons. Praskwiecz concluded that the remaining 487,000 tons of coal reserves had no economic value, and he ignored them. When questioned about the quality of the coal in the four seams present in the Cooke property, Praskwiecz stated, "The quality is a low to middle quality steam coal, which can definitely be sold on the steam coal market, and at a price." J.A., vol. II, p. 27. On cross-examination, Praskwiecz acknowledged that only one of the data points he used in his evaluation was actually located on a Cooke tract and that the quality of the coal seams fluctuated in Lawrence County. Also, he admitted that there were some impurities present in the coal but not, in his opinion, enough to affect the coal's marketability.

Praskwiecz further testified that in his opinion the highest and best use of the Cooke tracts was coal mining. In determining market value, Praskwiecz testified that the preferred approach in the industry is to use comparable sales. However, he identified only two sales which were similar enough to be considered comparable and found that these were insufficient to establish a market trend. Instead, he used a discounted cash flow analysis. When his calculations were completed, Praskwiecz determined that the present net value of the Cooke leases was $427,000 and that this was the fair market value at the time of taking.

Gene Samsel was the first witness for the United States. His background included work for an environmental service firm and performing coal reserve evaluations for a consulting engineering company. He had worked in the coal mine industry in Lawrence County and still owned land there. Samsel concluded that it would not

be economically feasible to mine the coal located on the Cooke tracts because of the erratic nature of the thickness of the seams and the poor quality of the coal. Samsel admitted on cross-examination, however, that his work with the consulting engineering company was primarily in management and that he had mined 80,000 tons of coal in eight years on his own Lawrence County tract and presently leased the rest at $2 per ton. Samsel did not perform a reserve study himself. Rather, he based his conclusions upon the reports prepared by the three other expert witnesses in the case. He agreed with Praskwiecz regarding the accepted standards for the categories of proven and probable coal, but stated that they were not used in Lawrence County to a great degree because of the erratic nature of the coal there. Samsel further noted that the reports he relied on also showed that the quality of coal on the Cooke tracts was inconsistent.

The government's next witness was Samuel Fish, a mining engineer with more than 17 years of experience who had performed a coal study and appraisal of the Cooke leases involved in the Yatesville Lake Project. With the help of charts he presented his figures for the amount of proven and probable coal on each of the subject tracts. His figures totaled 34,000 tons of proven coal and 184,000 tons of probable coal. However, he opined that only four tracts had any potential for economically feasible mining in the future and that the other tracts did not contain enough coal to justify the development costs. Fish was somewhat confused as to the total monetary value he had calculated, stating three different figures ranging from $31,600 to $41,600. He was also unsure of the total tons of coal he estimated on the leased tracts. Fish was extensively cross-examined and admitted that he had used a non-standard measurement for determining the amount of probable coal reserves. He also admitted that, although he claimed to be using what he called a discounted royalty analysis, he had not used a "true one" nor had he "exactly" used a comparable sales analysis, relying instead upon his own experience in computing a discounted rate per

ton of mineable coal in place. During a break in the trial, Cooke's counsel moved to strike Fish's entire testimony; however, the court reserved its ruling on this issue.

Thereafter, the government called its final witness, John Donan, Jr., a consulting engineer with degrees in geology and geological engineering. Donan testified that he is a registered professional engineer in Kentucky, Indiana, and Illinois, and a registered geologist in West Virginia and Indiana. Most of his mineral work has been in eastern Kentucky, and Donan stated that he is very familiar with Lawrence County, Kentucky, and the Yatesville Lake Project. When asked by the Corps of Engineers to appraise the Cooke leases, he performed a study of the coal industry in Lawrence County, a geological study, and an appraisal of the coal reserves in question. Donan emphasized that whether coal is categorized as "proven" or "probable" does not mean that it is economically feasible to mine. He described in detail the coal seams as found on and near the Cooke tracts, summarizing that they "are split; they are full of impurities, and they are thin." Donan also described in detail attempts by coal companies, doing business in Lawrence County, to mine the same coal seams which run through the Cooke tracts. According to Donan, most of these attempts to mine proved unprofitable, many were abandoned, and some resulted in the mining company going bankrupt and/or defaulting on its reclamation bond.

Donan estimated approximately "158,000 tons of coal, not necessarily mineable, but there." J.A. 64. In Donan's opinion, only three of the Cooke tracts had mineable coal, but they were not economical to mine because there was not enough coal in those tracts. Donan's opinion on the highest and best use of the Cooke coal mine leases was to combine them back into the title in order to clear the title. He used a comparable sales approach in order to determine fair market value of the Cooke leases and concluded that the total value was approximately $48,000. Cooke's counsel cross-examined Donan over dissimilarities between the Cooke leases and the four sales he used

to determine fair market value. At the conclusion of Donan's testimony, Cooke's counsel moved to strike his testimony concerning the comparable sales. The district court overruled both this motion and the previous motion to strike Fish's testimony.

## II.

██ Just compensation for condemned property is that amount of money necessary to put a landowner in as good a pecuniary position, but no better, as he would have been in if his property had not been taken. It is measured by the highest and best use of the land—that use which would bring the highest price. *United States v. 1,291.83 Acres of Land*, 411 F.2d 1081, 1083 (6th Cir.1969). In the absence of proof to the contrary, the current use is presumed to be the best use. *See United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir.1991). The highest and best use of the property can be based upon reasonable future probability; however, "speculative and remote possibilities cannot become a guide for the ascertainment of value," especially when the creation of such a potential use would require a substantial investment of capital. *1,291.83 Acres of Land*, 411 F.2d at 1083–84. Moreover, overcompensation is as unjust to the public as undercompensation is to the property owner, and the landowner bears the burden of proving the value of the land. *69.1 Acres of Land*, 942 F.2d at 292.

### A.

██ Cooke's first two issues challenging the trial court's denial of its motion to strike the testimony of expert witness Fish are closely related and will be considered together. Cooke argues that the district court erred in refusing to strike Fish's testimony because it was not based upon accepted industry standards and because it confused the jury to the prejudice of Cooke.

"Admission of expert testimony is a matter within the broad discretion of the court, and a decision to admit such testimony is to be sustained unless manifestly erroneous." *United States v. Pearce*, 912 F.2d 159, 163

(6th Cir.1990), *cert. denied*, 498 U.S. 1093, 111 S.Ct. 978, 112 L.Ed.2d 1063 (1991) (citing *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1218 (6th Cir.), *cert. denied*, 484 U.S. 820, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987)).

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

██ Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact. *See Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 919 (6th Cir.1984). This court has used a four-part test to uphold the admission of expert testimony: "(1) a qualified expert (2) testifying on a proper subject (3) which is in conformity to a generally accepted explanatory theory (4) the probative value of which outweighs its prejudicial effect." *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1208 (6th Cir.1988).

The first two parts of this test are easily met by the government. Cooke does not dispute that Fish is an expert in the field of mine engineering, and the subject matter of his testimony was directly relevant to the sole issue of fair market value of the Cooke coal leases. The third part is somewhat more problematic and forms the basis of Cooke's first argument on appeal.

Cooke, while willing (at least during the trial) to concede the admissibility of Fish's testimony relating to his coal reserve study, strongly argues that his valuation of those coal reserves in place did not conform to the generally accepted method of discounted cash flow analysis. Cooke correctly points out that Fish could not put an accurate name on his method of arriving at his figure of $41,518 and was not adept at explaining his methodology. The district

court did not clearly err in finding the disputed testimony admissible. Cooke relies upon *United States v. 103.38 Acres of Land,* 660 F.2d 208 (6th Cir.1981), for the proposition that Fish should have followed the discounted cash flow method described therein. However, *103.38 Acres of Land* is distinguishable because the parties in that case agreed that the highest and best use of the land was mineral extraction and that there was a ready market for the coal from the Van Lear seam involved. *Id.* at 210. There is no such agreement in this case. Instead, all three of the government's experts concluded that mineral extraction was *not* an economically feasible use of the Cooke tracts. The government experts, including Fish, could therefore have concluded that some other method of valuation was called for. Moreover, the court in *103.38 Acres of Land* did not hold that the discounted cash flow analysis was the *only* acceptable method of valuation in the absence of comparable sales.

■■■ In land condemnation proceedings, the comparable sales method of valuation is the preferred approach of establishing the fair market value of property. *Id.* at 211. However, when comparable sales do not exist, "[t]he law of evidence ... favors a broad rule of admissibility and is designed to permit the admission of all evidence which is relevant and material to the issues in controversy, unless there is a sound and practical reason for excluding it." *United States v. 2,847.58 Acres of Land,* 529 F.2d 682, 687 (6th Cir.1976). The owner's compensation depends upon the circumstances of each case; no general formula should be used and some speculation is inherent in any valuation of resource property. *See United States v. 22.80 Acres of Land,* 839 F.2d 1362, 1365 (9th Cir.1988) (citing *United States v. Miller,* 317 U.S. 369, 373–74, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943)).

■■■ Where an expert's testimony amounts to "mere guess or speculation," the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the

expert's factual basis. *United States v. 0.161 Acres of Land,* 837 F.2d 1036, 1040 (11th Cir.1988). Fish's opinion was not mere speculation. He did, in fact, have a basis for it: his estimation of the coal reserves in place, his determination that the best use of the Cooke tracts was as a highly speculative future coal resource, and his own lengthy experience in mine engineering. Cooke has presented no sound and practical reason for the exclusion of Fish's valuation testimony except for its allegedly weak basis and Fish's inability to explain it clearly. As the district court correctly ruled, however, any weaknesses in the factual basis of an expert witness' opinion, including unfamiliarity with standards, bear on the weight of the evidence rather than on its admissibility. *See Davis,* 742 F.2d at 919; *Upjohn Co. v. Rachelle Laboratories, Inc.,* 661 F.2d 1105, 1112 (6th Cir.1981).

■■■ The Federal Rules of Evidence allow an expert great liberty in determining the basis of his opinions and whether an expert opinion should be accepted as having an adequate basis is a matter for the trier of fact to decide. *See Mannino v. International Mfg. Co.,* 650 F.2d 846, 853 (6th Cir.1981). Because Fish's testimony was clearly relevant to the issue at trial and did have some factual basis, it was admissible.

■■■ Cooke's second argument on appeal addresses the fourth part of the *Sterling* test. Cooke argues that the confused nature of Fish's testimony misled the jury and that this prejudicial effect outweighed its probative value. This conclusory allegation is insufficient to exclude Fish's testimony. As previously noted, defense counsel extensively cross-examined Fish. Where an adversary party has full opportunity to refute an expert's testimony during cross-examination, exclusion due to the danger of misleading the jury is generally inappropriate. *See 0.161 Acres of Land,* 837 F.2d at 1042.

Fish's testimony passes the four-part test for admission of expert testimony, and the district court's denial of the motion to strike was not clearly erroneous. More-

over, even if it is assumed that the admission of Fish's testimony was erroneous, its admission was harmless in light of the extensive cross-examination conducted by Cooke's counsel, which highlighted flaws and inconsistencies in the testimony, and the trial court's jury instructions, which charged the jurors that they were to determine the weight to give each expert's opinion and could disregard expert testimony in whole or in part if they found it to be unsound. *See Davis,* 742 F.2d at 919–20.

### B.

Cooke next argues that the jury's verdict is clearly against the weight of the evidence. This issue was properly raised in the district court in a motion for a new trial. *See Dixon v. Montgomery Ward,* 783 F.2d 55 (6th Cir.1986). When ruling upon a motion for a new trial based upon this ground, the district court must compare the opposing proofs, weigh the evidence, and set aside the verdict only if it determines that the verdict is against the clear weight of the evidence. *See Woodbridge v. Dahlberg,* 954 F.2d 1231, 1234 (6th Cir.1992). The motion should be denied if the verdict is one which could reasonably have been reached, and "[t]he verdict is not unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." *Id.* The district court's denial of a motion for a new trial based upon this ground is reviewed for abuse of discretion. *Id.*

The district court did not abuse its discretion in finding that the evidence presented at trial was sufficient to support the verdict. Cooke argues that the jury placed "apparent reliance" on the testimony of Fish and rejected the "competent" testimony of its own witness, Praskwiecz. Appellant's Brief at 24. Cooke's conclusory assumption that the jury relied upon Fish's testimony is pure speculation. All the witnesses, including Praskwiecz, testified that the coal present on the Cooke tracts was erratic and of low quality. The evidence also showed that Cooke had held the leases since the early 1970's without establishing a single mining operation on any of the subject tracts. Thus, the jury could reasonably have rejected Praskwiecz's opinion that the highest and best use of these tracts was coal mining and accepted the testimony of the three government witnesses that it was not economically feasible to mine this coal. Donan, in particular, explained in detail the results of his study of the varying thickness of the coal seams in each of the tracts and the amount of impurities found within each seam. Witness credibility is solely within the jury's province, and this court may not remake credibility determinations. *See 22.80 Acres of Land,* 839 F.2d at 1365.

Moreover, because the jury's award of $65,000 is within the range of $41,518 to $427,000 established by the evidence, it cannot be said to be against the weight of the evidence. *See United States v. 50.822 Acres of Land,* 950 F.2d 1165, 1168 (5th Cir.1992); *United States v. 177.51 Acres of Land,* 716 F.2d 78, 82 (1st Cir.1983); *United States v. 2,635.04 Acres of Land,* 336 F.2d 646, 649 (6th Cir.1964). Accordingly, the district court did not abuse its discretion in finding that the jury's verdict was not against the weight of the evidence.

### III.

For the reasons stated, the judgment of the district court is AFFIRMED.